| | |
|---|---|
| 41 | 111 |
| 54 | 412 |
| 41 | 111 |
| 55 | 15 |
| 41 | 111 |
| 31 | 257 |
| 61 | 301 |
| 41 | 111 |
| e73 | 190 |
| 73 | 192 |
| 41 | 111 |
| 80 | 375 |

## PATTON v. COATES.

1. **ELECTION:** *Power of the canvassing board.*
  The board of canvassers of an election have no judicial discretion whatever. They are merely for the purpose of a fair and correct computation of the votes, under public surveillance, upon the face of the poll books presented to them by the clerk. They have no power to reject any poll book which is certified substantially as required by the statute, regardless of irregularity or informality, if it intelligibly indicate the intention of the voters.

2. **SAME:** *Clerks.*
  The clerks of an election are not required to certify the poll books, but only to sign as attesting witnesses to the signatures of the judges, and this may be done by a clerk not serving when the election began.

3. **SAME:** *Substitution of judges: Presumption.*
  When the poll books are certified by different judges from those appointed by the county court, it will be presumed in the absence of

proof to the contrary that they were substituted by the voters for the appointed judges in the manner provided by the statute; especially where it appears that the judges who certify were sworn and acted.

4. SAME: *Sealing poll books.*

The failure or omission of the judges to seal the poll book before sending it to the clerk, will not invalidate it where it has no appearance of having been tampered with.

5. SAME: *Fraud, intimidation, coercion, etc.*

In a contested election case for a county office, a party may overturn the election returns of a township by showing fraud or the equivalent of actual fraud on the part of the election officers of the township; which will of itself vitiate the election in that township; or by showing such fraud, intimidation or coercion of voters, or system of illegal voting on the part of others, not officers, as would change the result or render it uncertain; or he may show such number of illegal votes for his opponent in excess of illegal votes for himself in the whole county as would leave him a majority of the legal votes cast; and if by any one, or all of these means collectively, it should appear that he had received the majority of the legal votes cast, (including those offered and refused and excluding the illegal votes received), he should prevail.

6. SAME: *Evidence: Opinions of witnesses.*

The opinion of a witness from what he saw at the polls, as to the freeness and fairness of an election, is not admissible as evidence. He should state the facts and not his opinion based upon them.

7. SAME: *Evidence: Declarations of voter after the election.*

The declarations of a voter as to the fact of his voting and how he voted, are admissible as evidence where the purpose is not to exclude the particular votes but to show the existence of an unlawful combination by declarations composing a part of the *res gestæ*.

8. SAME: *Same.*

The poll books and certificates of the election officers are *prima facie* evidence of an election.

9. SAME: *Intimidation..*

Whenever there is intimidation sufficiently powerful to change the result, or make it doubtful what the result would have been without it, it is sufficient to impeach the poll without any regard to the personal courage of the voters deterred.

APPEAL from *Pulaski* Circuit Court.

Hon. F. T. VAUGHAN, Circuit Judge.

*Compton, Battle & Compton, R. C. Newton* and *Geo. W. Caruth*, for appellant.

1. Intimidation of voters existed sufficient to change. or make uncertain the result of the election. *McCrary on Elections, secs. 416, 417, 418, 419, 422, 424, 425, 426, 429, 432.*

2. Frauds were perpetrated by persons *other than officers of election*, sufficient to change or make uncertain the result. *Ib., secs. 441-2, 365-6, 387, 391-2-3; Mann v. Cassidy, 1 Brew., p. 1; 2 Id., p. 40, 49, 53.*

3. The conduct of the judges in the sixth ward amounted to *legal*, if not actual, fraud, and was such as to destroy the integrity of the returns, and the vote should have been excluded, *even though the result of the election was not thereby changed or made uncertain. McCrary on El., secs. 441-2, 199, 365-6, 386-7, 391-2-3; 1 Brewster, 1; 2 Id., 40, 49, 53.*

4. The declarations of the Varner negroes, not under oath, the day after the election, while on their return from Little Rock, as to how they voted and their disqualification to vote, was admissible. *27 N. Y., 45, 52; 23 Wis., 319; Note 3, McCord, (S. C.), 230; 9 Kansas, 569; McCrary on Elec., sec. 270.*

5. Appellant was entitled to a jury trial. *Acts 1874-5, p. 92, secs, 71-2-3, 67-8; sec. 4641, Gantt's Dig.; 28 Mo., 275-6; 43 Ib., 293.*

6. The testimony of witnesses as to their opinion whether upon the facts which they had testified, and the appearance of the parties at the polls, the election was a free and fair one, was admissible. *1 Greenl. Ev., sec. 440, and cases cited.*

7. The court abused its discretion in overruling the motion for a continuance. *10 Ark., 527; Collins v. Karatopsky, 36 Ark.*

8. The *ballots themselves* are the highest evidence of the

result of an election, and plaintiff should have been required to produce them, *unless he could show they had been tampered with, or had not been preserved as required by law, or were otherwise resting under suspicion so as to make the poll books competent.* McCrary on Elec., sec. 291; 28 Cal., 123; Acts 1874-5, secs. 45-6-7, p. 100.

9. The court erred in its finding of facts. It was its duty to *carefully scrutinize the evidence and weed out all illegal votes,* when he determined to throw out Eastman and Eagle townships. Throwing out the illegal votes *proved,* appellant was, upon a fair canvass of the legal votes, elected.

10. There were such frauds in the sixth ward, apparent, upon the face of the poll books, as should have compelled, the court below to exclude the ward from the count. McCrary on Elections, sec. 449.

*S. P. Hughes, J. W. Martin, Collins & Balch,* for appellee.

1. The refusal of a continuance is a matter of sound and, reasonable discretion to be exercised by the trial court. 9 Ark., 111; 13 Ib., 734; 22 Ib., 166; 24 Ib., 601; 19 Ib., 601; 64 Ga., 404; 34 Cal., 635; McCrary on Elections, secs. 310, 381, 276, 285.

2. The amendment of the complaint was proper. Act 1875, sec. 68; Gantt's Dig., sec. 4638.

3. Appellant was not entitled to a jury. 32 Ark., 553; 36 Ib., 306; 43 Penn. St., 389; 2 Parsons, 553; 62 Ind., 61; 6 Cold., 382; 26 Minn., 539; 52 Tex., 335; Cooley Const. Lim., p. 513, note 3; Brightly Election Cases, p. 364; McCrary on Elec., secs. 288-9. The action was not for "recovery of money or specific real or personal property." Gantt's Dig., secs. 4641-2; Acts 1875, sec. 68.

4. The canvassing justices had no judicial functions to

perform, nothing but to make and certify an abstract of the returns. *Act 1875, secs. 46 to 52; McCrary on Elec., secs. 81, 458; Cooley Const. Lim., *622; 26 Ark., 100; 10 Heisk. Tenn., 252; 16 Kan., 107; 72 Mo., 365.*

5. The original poll books were *prima facie* evidence of the correct result, subject to be impeached by evidence *alinude. Act 1875, secs. 46 to 52; 21 Kan., 186; 79 N. Y., 290; 91 Ill., 525; 47 Miss., 37; 16 Ohio, 189; 82 N. C., 389; Abbott's Trial Evidence, 749; Brightley's Elec. Cases, 383 etc.; Cooley Const. Lim., *625; McCrary on Elec., secs. 96, 213, 277, 278, 280, 287, 306, 365-6, 371-2, 388, 436, 438, 456; 26 Oh. St., 555.*

6. Returns should not be rejected for any kind of mere "informality or irregularity." *Act 1875, sec. 51-2; State v. Johnson, 17 Ark.*

7. Officers not sworn are officers *de facto. 39 Ark., 549; McCrary on Elections, secs. 76-7-8-9.*

8. Opinions of witnesses not admissible, as to whether or not there was a "free and fair election." *37 N. Y., 192; 63 Ala., 176; 2 Porter, 29; 2 Const. 515; Abbott's Trial Evidence, 272; 1 Greenl. Ev., sec. 440.*

9. Delany's testimony as to what persons said next day seventy-five miles away—no other showing that they voted, and no effort to get the parties before the court, clearly inadmissible. *9 Kan., 581; 76 Ill., 46; 81 Ib., 549; 1 Greenl. Ev., 124 S.; 79 Ind., 282; McCrary on Elections, secs. 272-3.*

10. Closing the polls for dinner is only an irregularity and will not vitiate an election if it appears that no one was deprived of his right to vote by reason of it. *39 Ark., 557; McCrary on Elec., secs. 126, 128; Cooley Const. Lim., *618-21.*

11. All of appellant's instructions were given, except the sixth, and the law correctly stated as asked by the plaintiff

and by the court on its own motion. *Cooley Const. Lim.,* *624; McCrary on Elec.,* secs. 219, 290, 302–3, 365, 416, 436, 438.

12. Illegal votes when not shown how they voted, are to be distributed *pro rata. McCrary on Elections, 298, 300; Brightly Elec. Cases, p. 248, 492.*

13. While there was a noisy, boisterous crowd and a warm canvass for votes at the sixth ward, there was no force nor violence nor intimidation. Not a single voter was presented who failed to vote as he desired. Nothing to prevent men of ordinary courage from casting their vote as they desired. No poll books were returned with more exact conformity to law than from this ward, by officers from both parties whose integrity is beyond question. *39 Ark., 557; 35 N. J., 277; 47 Miss., 47; 82 Penn., 299; 68 Pa. St., 333; 50 N. H., 142; 13 B. Mon., 515; Brightly Elec. Cases, 448; 1 Dill. on Mu. Corp., sec. 197, n. 3; Cooley Const. Lim., *618–21; McCrary on Elec.,* secs. 416, 421–3, 429.*

14. If persons were intimidated they ought to have been brought forward and proved it. *McCrary, secs. 430–1.*

15. This court will not reverse on mere weight of evidence, the verdict of a jury or the finding of a court., *10 Ark., 140; 11 Ib., 630; 23 Ib., 32, 55; 24 Ib. 443; 25 Ib., 91; 26 Ib., 362; 27 Ib., 592; 34 Ib., 639; 36 Ib., 260; State v. Miller, 40 Ark.; 62 Ind., 61; 61 Mich., 158.*

16. If Eastman, Eagle and the sixth ward are all to be rejected, there was no legal election and the present county officers have no legal title to their offices. *McCrary on Elections,* secs. 286, 425, 426, 427, 428, 429; *Cooley Const. Lim., p. 621; 1 Sneed, 696; 2 Swan. (Tenn.), 71; 3 Hill, (N. Y.), 42; 19 Wend., 45; Angel & Ames on Corp., sec. 138.* And would be unable to justify their official acts and be liable in damages. *32 Ark., 666;*

*37 Barb., 160 ; 7 Kans., 427 ; 2 Swan. (Tenn.), 88 ; 15 Vt., 653 ; 7 N. H., 207 ; .5 Heisk., 80 ; 6 Hun. N. Y., 657 ; 15 How. Pr., 477.*

17. Review the testimony and contend that a sufficient number of illegal votes were not shown or proved to change the result, and that the finding and judgment of the circuit court were correct.

*M. W. Benjamin,* also for appellee.

Makes the same points as his co-counsel ; ably reviews the thirty grounds of appellant's motion for new trial, and cites many additional authorities, but this abstract is already too long to insert more.—[REPORTER.]

STATEMENT.

On the fourth day of September, 1882, at a general election for State and county officers, James Coates and Wm. J. Patton were candidates for the office of judge of the Pulaski county court ; the former on what was known as the straight republican ticket, and the latter upon a composite ticket, made up of members of the republican and democrat parties, called the "People's ticket."

Upon the return to the clerk of the poll books from the different voting precincts of the county, twenty-three in all, he called to his aid two justices of the peace, who, under section 46 of the act of June 23, 1875, proceeded to open and compare the returns, and make abstracts of the votes. It was found upon the face of all the returns, if valid, that there had been no other candidate for the office ; and that, of the 8,169 votes cast, Coates had received 4,403, and Patton 3,766. The board, however, rejected the returns from six of the precincts, to-wit: Ashley, Badgett, Eagle, Ellis, Roland, and the sixth ward of Little Rock, by which it appeared that Coates had received 2,740 votes, and Patton

Patton v. Coates.

3,133. The certificate of election was accordingly issued to Patton, who, on the thirteenth of October, obtained a commission from the governor, and entered upon the duties of the office. The county clerk had refused to sign the abstract thus made.

On the fifteenth of February, 1883, Coates filed this complaint in the circuit court to contest the right to the office, alleging that he had received a majority of the votes; that the canvassing board had rejected the returns from the five precincts unlawfully, and that really as many as 300 illegal votes had been cast in the election for Patton. He sets forth the number of votes cast at each precinct, with the total for each.

Patton denied the allegations as to the number of legal votes cast in seventeen of the precincts, to-wit: Ashley, Badgett, Big Rock, Campbell, Eagle, Eastman, Ellis, Fourche, Gray, Pyeatte, Roland, Union, Young, first, second, third and sixth wards of Little Rock. The only precincts concerning which there is no issue, are Bayou Meto, Maumelle, Mineral, Owen, and the fourth and fifth wards of Little Rock; which, together, gave Coates 356 votes, and Patton 1,095. He denies that any illegal votes were cast for himself, or that plaintiff was elected, or that the abstract made by the canvassing board was false or fraudulent.

With regard to the sixth ward, he denies that there was a free and fair election; but charges intimidation, violence, and disturbances on the part of friends of plaintiff, by which a large number were prevented from voting for defendant, and many others against their will were compelled to vote for plaintiff, and others deterred from voting at all. That the result was thereby rendered uncertain. He charges also that of the votes cast for plaintiff, a large number were by unpardoned convicts and non-residents, who were not competent electors.

The same denials and charges are made with regard to Ashley, Badgett, Eagle, Campbell, Eastman, and Young, and similar charges as to illegal voting are made with regard to Pyeatte, and the first, second and third wards of the city; although no intimidation is alleged as to the latter list. Concerning Ellis and Roland there is a general denial of the allegations of the complaint; and it is alleged generally, that throughout the county, a large number of the votes cast for plaintiff were by minors and females, and by repeaters. The townships are specified in which the repeating occurred.

The answer further alleges fraud in the officers of the election in the townships of Eagle, Eastman, Campbell, and the sixth ward, in permitting the violence, intimidation, threats and frauds to be perpetrated; in admitting unauthorized persons into the voting places, where the returns and computations were made; in refusing lawful challenges to illegal votes for plaintiff; in allowing unqualified persons to vote for plaintiff; and in counting for plaintiff votes cast for defendant. It is also charged that in Eagle an unauthorized person acted as judge, and a clerk was allowed to absent himself, whilst an unauthorized person acted in his place and assisted in summing up the false returns.

The special precincts in which the elections are claimed to have been wholly void, are Ashley, Badgett, Campbell, Eagle, Eastman, Young, and the sixth ward.

He claims that the illegal votes and repeatings would reduce plaintiff's apparent vote so as to give a majority to defendant.

On the twenty-first of March, 1883, the defendant moved for a continuance on account of absent witnesses, which was overruled. He then demanded a trial by jury; whereupon the plaintiff was allowed to amend his complaint by striking out all claim for damages, and trial by jury was refused.

The trial by the court began on the twenty-second of

March, and was prolonged until the fifth of April, when judgment was rendered in favor of Coates. The court found that the returns were substantially made in accordance with law, and that the election had been fair and regular in all the precincts, save Eagle, Eastman, and the sixth ward. In the two former precincts he found the election void on account of intimidation and other improper practices, and threw their votes out of the count. In the sixth ward, although there had been great irregularities and much improper conduct, which he strongly condemned, he did not think it sufficient to render the result uncertain, and counted the whole vote, thus showing the election of Coates by a majority of 118 votes.

There was a motion for a new trial, exceptions and appeal.

## OPINION.

EAKIN, J. The general election law of January 23d, 1875, (p.92, acts 1874 and 1875), makes it the duty of the county court, at the last term held more than thirty days before any general election, to appoint three judges of election in each township, to continue in office until the next general election; and provides that the judges shall select two persons to act as clerks. If the county court should fail to appoint them, or if those appointed should fail to act, then the voters, when assembled, may appoint them, (secs, 3, 4 and 5). It is made the duty of the county clerk in advance of each election, to make out and deliver to the sheriff two blank poll-books for each township, properly laid off in columns, with proper captions, and forms of oaths and certificates attached thereto; with pages sufficient to record the names of the voters. These books are to be delivered to the judges of the election. (Secs. 14 and 15).

At the election, the clerks are required to register the names of all the electors, with appropriate numbers, in the

Patton v. Coates.

order in which they present their ballots, and at the closing of the polls, it is required that the poll-books shall be signed by the judges and attested by the clerks, and that the "*names*" therein shall be counted and the number set down at the foot of the poll books. After the poll books are thus signed, the count of ballots shall proceed, each ballot passing through the hands of every judge until as many shall be counted as there are names on the poll books. The clerks, meanwhile, are required to enter on "a list or poll book," in separate columns, under the name or names of the persons voted for, the number of votes given for each person, as read by the judges; and shall, moreover, write out in a legible hand, the number of votes given for each person respectively. Then after enumeration under the inspection of the judges, and after the numbers shall have been set down at the foot of the column in the list or poll books, and public proclamation of the result, it is made the duty of the judges to certify under their hands the number of votes given to each person, and the office, which also shall be attested by the clerks. (Secs. 32 to 40). It is then the duty of the judges before dispersing, to put one of the poll books under cover, and seal the same, and direct it to the county court clerk, to be delivered to him by one of the judges. The other is to be retained by the judges free for the inspection of any body. It is then the duty of the clerks on the fifth day after the election, or sooner if all returns are in, to take to his assistance two justices of the peace, or, if more convenient, two house holders, and to open and compare the returns and make abstracts of the votes given for the several candidates on separate sheets of paper, which shall be signed by any two of the canvassing board and deposited in the clerk's office. It is provided that this canvassing or comparing shall be done openly and publicly, after proclamation at the court house door; that informality in the certificate of the judges and clerks shall not

10—R

Patton v. Coates.

cause any poll book to be rejected, and that the votes shall be added and counted regardless of any informality whatever, unless it be such that they are unable thereby to arrive at the result, or the true intention of the voters. Certified copies of these abstracts are to be sent to the secretary of state. It is made a high misdemeanor, punishable with fine and imprisonment, in the clerks and justices, or house holders, or either of them to reject or refuse to count the vote shown by any poll book. (Secs. 46 to 52).

1. ELEC-
TION.     It will thus be seen that the board of canvassers have no
Power
of can- judicial discretion whatever—that they are merely for the
vassing
board.    purpose of a fair and correct computation of the votes under public surveillance, upon the face of the poll books presented to them by the clerk, one of their number ; and that they have no authority to reject any poll book which comes to them certified, in form and matter, substantially in accordance with the provisions of the statute, regardless of informality or irregularity ; provided it be intelligible to indicate the true intent of the voters. Other provisions are made for securing the fidelity of the judges and the identity of the poll books until they reach the county clerk. The judge, to deliver each one, must be designated by lot, if not by agreement, and upon failure to perform the duty, he is liable to indictment and a fine of $200.

2. ———:
Clerks    It is plain enough from the evidence that the poll books
not to cer-
tify to poll from all the townships and wards in the county were those
books, but
only to  actually used and made up by the officers holding the elec-
witness
signatures tion ; that they are *substantially* authenticated in accordance
of judges.
with the statute ; and that they contain no internal indications of fraud. It is to be observed that the clerks are not required to certify anything. It is the judges who sign the poll books, and certify the number of votes. The clerks merely sign as witnesses of their signatures, so that it can make no difference, that the clerk attesting was not serving as clerk when the election began. This was the case in one

Patton v. Coates.

of the townships, where a change of clerks became neces-
sary.

In one of the townships, one of the judges, and in another, **3. CHANGE OF JUDGES. Presumption.**
two, were not the same as those appointed by the county
court. But the statute contemplates substitution in cer-
tain cases, by the voters, and no mode is prescribed for
doing it, or certifying that it had been done. In the absence
of proof to the contrary, especially where it appears that
the judges who certify were sworn and acted, it will be pre-
sumed it was done.

One poll book was sent up in a box tied with a **4. Sealing poll books.**
rope. This is not sealing, and is but a rude substi-
tute for it, but when the poll book is identified and
has no appearance of having been tampered with, it would
be absurd to disfranchise all the voters of the township on
that account.

The court correctly ruled that the majority of the canvass-
ing board transcended its authority in rejecting any of the
poll books. The *prima facie* case of the plaintiff was thus
established, and the onus devolved upon the defendant of
showing, *aliunde*, that notwithstanding he was not properly
entitled to the certificate which formed the ground of his
commission, yet, that he really received the majority of legal
votes, or of those which could be properly counted, and
was thus, as against the plaintiff, entitled to retain the com-
mission. His position is shifted to that of a contestant, and
he is required to maintain his cause, as if the commission
had been properly issued to Coates, and he were seeking to
avoid it. This he might do by showing fraud, or the equiv- **5. Fraud, intimidation, coercion.**
alent of actual fraud, in the election officers in any township.
This would, of itself, vitiate the election in that township.
Or he might show such fraud, intimidation, coercion of
votes, or system of illegal voting on the part of others, not
officers, as would change the result, or render it uncertain ;
or might show such a number of illegal votes for his oppo-

nent, in excess of illegal votes for himself, in the whole county, as would change the result. The issues made by the pleadings are broad enough to admit of proof upon each, and all of these points. If, by any of these modes separately, or by all collectively, it should be shown that the defendant had received a majority of the votes which *ought to be counted*, he should prevail. Otherwise, the *prima facie* case of the plaintiff upon the returns would remain unshaken.

By "votes which ought to be counted," we mean to imply the exclusion of particular illegal votes received, and the count of particular legal votes rejected, in any township or ward of the county, within the scope of the issues made, although the main vote of the township be not rejected ; and also the total exclusion of the whole vote of the townships when there has been perpetrated such fraud, or violence, or coercion, or combination for illegal voting, as to change the result or render it uncertain ; or when there has been shown such fraud on the part of officers of the election as should discredit the returns.

When the whole poll may be rejected. There is a distinction, in the nature of things, between particular illegal votes which may be proven and exactly computed, and which certainly ought to be excluded, wherever cast, and the effects of fraudulent combinations, coercion, and intimidation. It can never be precisely estimated how far the latter extend. Fraud is secret, and timidity shrinks from observation. Their effects depend on moral perversions, nervous organizations and constitutional idiosyncracies. They cannot be arithmetically computed. Awe is silent and undemonstrative. Peace may be abject as well as the result of satisfaction. Yet it cannot be said that elections are "free and equal" where fraudulent combinations for illegal voting override honest votes, or where fear deters from the exercise of free will, although there may be no turbulence. It would be to encourage such things, as

the ordinary machinery of political contests, to hold that they shall only avoid to the extent their influence can be computed. It seems clear that courts must abnegate the power of preserving the freedom of elections, and abandon the polls to the violent and unscrupulous ; or must take the ground, that wherever such practices or influences are shown to have prevailed, not slightly and in individual cases, but generally, and to the extent of rendering the result uncertain, the whole poll must be held for naught. The evils of an occasional success of a minority, if that should sometimes happen in the effort to sustain the fundamental principle of our government, would be but temporary ; and in any case would be but slight, in comparison with the subversion of free government, which would surely follow the continued practice of rendering the freedom of elections a mockery.

And by the "result," it is to be noted, we mean the result in the county or district, or State, where that result depends upon the *aggregate* vote. There can be no other sensible application of the rule. For instance, if in all the undisputed townships at a county election, one candidate should have an aggregate majority of 500, and in another township his opponent should receive a majority of 505, and it were shown, moreover, that fraud, violence and intimidation in behalf of the latter had been used in that township with uncertain effect, it would not be required to show that it was uncertain whether or not, without it, he would have received a *majority in that township*. Perhaps his legitimate majority might have been 499, but that would not elect. It would be sufficient to show that, but for the improper practices, it is uncertain whether or not his majority would have exceeded 500 votes. Here a very few fraudulent votes would actually change the result, but his opponent would be helpless if he could not show a reasonable ground of apprehension that the fraudulent votes or suppression of votes

amounted to 505 or more. In the case supposed, six fraudu-lent votes would change the result, and it would, in order to exclude the township, be sufficient to show reasonable grounds for believing that the fraud or hostile influences,. had made a difference of six in the majority of the township ; in other words, to show that without the fraud, &c., it would be doubtful whether or not the majority of the vote in the township would have exceeded 500.

Upon the other hand, it devolves upon the courts not to press this principle too far, nor apply it lightly to slight in-dications of fraud, violence or intimidation. Its applica-tion, indeed, is a matter of the gravest and most anxious re-sponsibility, inasmuch as it involves, necessarily, the dis-franchisement, in the particular election, of all the honest voters of the township. The wrong should appear to have been clear and flagrant ; and in its nature, diffusive in its influences ; calculated to effect more than can be traced ; and sufficiently potent to render the result really uncertain. If it be such, it defeats a free election, and every *honest* voter and intimidated or deceived voter is aggrieved there-by. It is his interest to sacrifice his own vote to right the evil. If it be not so general and serious, the court cannot. safely proceed beyond the exclusion of particular illegal votes, or the supply of particular legal votes rejected.

By these principles of purgation, which we take to be in-dubitable, the main issues in this case must be tested and de-termined. They are not new, but have been applied in other States, and in *most* points are conceded by counsel in their briefs and arguments. Their application in this State is more imperative, on account of the *express* declaration and injunction of our organic law. The 2d Section of Art. III of the Constitution declares, that, "Elections shall be free and equal," and that "no power, civil or military, shall ever interfere to prevent the free exercise of the right of suffrage." This would be a dead letter, if fraud and in-

timidation could produce its fruits, unless those who were the victims could *clearly* show that, without them, the result would have been different. It is a great concession to human folly, and human excitement, to require them even to show that the improper practices rendered the result uncertain.

Before proceeding, however, to consider the principal question upon the facts of the case, some minor points require attention.

It is contended that the court erred in refusing a continuance. The motion for it was based upon two grounds:

1st. Want of time to prepare the evidence, generally, after commencement of the suit.

2d. The absence of certain witnesses, by whom defendant expected to prove facts material to show that there had been fraud, coercion, intimidation and illegal voting in the election, to the detriment of the defendant.

The grounds, the expected evidence, and due diligence were explicitly set forth in detail, and we may say, at once, that in a matter involving private interests, a fair ground for a continuance was made. It is evident, however, that in this peculiar class of cases, the public has an interest in their speedy settlement; and that the object of the contest would be defeated by delay, and that irremediably. There should be no delay without strong reasons; and a refusal of a continuance would not, without gross injustice shown, be imputed to a Judge, as an abuse of discretion. The statute provides, generally, for the contest of elections for county and township officers to be made before the county court, and contemplates haste. If fifteen days have elapsed since the election, it directs that the determination be made at the first term, or if less than fifteen days, then at the second term; and that it be made in a *summary* way. It is also provided that the contest shall be commenced in six months. With regard to the office of county judge alone

·of county officers, it is provided, with manifest propriety, that the contest shall be "by complaint filed in the circuit ·court, *as other actions at law.*" We understand this to refer only to the mode of *beginning* the action, and not to the .subsequent proceedings, so as to put a contest of this sort in all respects upon the footing of an action for private property, or damages. The same public reasons prevail for .summary proceedings in the determination of the matter. It was but a reference to another tribunal of a matter which could not be determined in the county court. For this reason, too, we held in *Wise v. Martin, 36 Ark., 305*, that neither party was entitled in the circuit court to demand a trial by jury.

It is quite plain that the defendant had reasonable grounds to anticipate a contest within the six months, and was advised by the law that if made, it must be speedily and summarily determined. It would have been a matter of ordinary prudence, to have, all the time, been preparing for his ·defense. He could not be ignorant that he had obtained his ·commission through a gross misapprehension of duty, on the part of a majority of the canvassing board; and that, when called upon, he would be required to show, *aliunde*, that he was entitled to it, nevertheless.

The evidence of the absent witness was important, but was concerning facts which must, in their nature, have been proveable, if true, by a great many others. Fraud, violence, intimidation and coercion sufficient to change the result of an election, could not have been effective without coming to the notice, if not of everybody, at least of a great many. Under the circumstances we do not think the circuit judge abused his discretion in refusing the continuance.

6. EVIDENCE: Opinions of witnesses inadmissible.

Many witnesses were asked if *in their opinion*, from all they saw at the polls, and basing their judgment upon it, there was a free and fair election. They were not allowed to answer, and we think properly. Such evidence, if gener-

Patton v. Coates.

ally admissible in election cases, would be extremely dangerous, from its liability to abuse. Whatever may have been allowed in political assemblies, in contests for seats, cannot guide us as precedents in determining questions of strict law. Courts act upon settled rules of evidence, and no rule warrants the introduction of such opinions. They are but the results of the judgment.

The manner, appearance, cries, tones and gestures of a mob are facts and may be shown—that is, whether angry and determined and serious, or jocular and sportive, but the court or other tribunal must form its own opinions as to the probable effect.

A witness testified that on the morning after the election, he took a train at Little Rock, bound for Arkansas City; that he found upon it a crowd of about 25 colored men, who got off at Varner station, beyond Pine Bluff, which we know to be far beyond the limits of Pulaski county; that they carried in their hands yellow tickets, such as had been used in balloting in Pulaski county for the plaintiff on the day before; that they were met upon the platform at Varner, by another crowd of colored people, and that witness overheard the conversation between them. The defendant then offered to prove by this witness, that the arriving crowd displaying the yellow tickets, stated to the others, that they had not only voted that ticket on the day before, but had voted it in two wards of this city, and in Big Rock township of this county. The evidence was not allowed.

7. Declaration of voters after election, when admissible

If the foundation proof had gone to the extent of showing that this traveling crowd were not residents of Pulaski county, and consequently not electors there, the declarations might plainly have been considered, in connection with other evidence, as part of the *res gestæ* of the election; and as tending to show a fraudulent combination for the introduction of non-resident voters—there being other evidence *tending* to show the same thing. That the circumstances

11—R

were sufficiently connected with the election, in time and se-
quence, to partake of the nature of *res gestœ* seems plain.
The crowd was plainly going from the election to their des-
tination, with tickets in their hands, similar to those they
said they had used in voting.    There was no positive proof
that they were non-residents, but the circumstances justified
a strong inference that they were.    Their going immediate-
ly after the election, in a crowd, without explanation of
other business to take them away from home; their being
evidently expected by the crowd on the platform, and their
interest in the election, are all pregnant with the conviction
that they lived near Varner, and had gone to Pulaski to
vote.    They were evidently proud of the success of their
mission, and thought they had done a laudable thing.    Even
without proof of non-residence in Pulaski, they did boast
of their feat in successful repeating in the contest now in
question.    The declarations might well enough have been
considered in connection with other evidence as tending to
show a fraudulent conspiracy to secure the success of the
yellow ticket by repeating votes.    Notwithstanding some
conflict on the question as to whether or not the declarations
of a voter, as to the fact of his voting, and how he voted,
should be received, we incline to the opinion that they
should be, when the purpose is not to reject the particular
votes, but to show the existence of a fraudulent combina-
tion, by declarations composing a part of the *res gestœ.*
They stand upon the principle of the cries of a mob.    We
think the judge should have heard the evidence for what he
might consider it worth.    *People v. Pease, 27 N. Y., pp.
45, 52*; *McCrary on Elections, sec. 270.*    Whether or not
his refusal to do so materially prejudiced the defendant, in
its result, is a question to arise further on.

8.    Poll
books and
officers
certifi-
cates *prima
facie* evi-
dence.
The court held that the poll books and certificates of the
election officers of the townships, returned to the clerks,
might be used as *prima facie* evidence of plaintiff's election.

Patton v. Coates.

It is objected that they cannot be made instruments of evidence. That no provision is made for their preservation. That when the canvassing board has used them, in making their abstract, they have fulfilled their function, and cannot afterwards be regarded. We do not assent to that view. No special directions are given for their preservation, it is true, but they ought, nevertheless, to be preserved by the clerk. They are essential to determine whether or not the canvassers have done their duty. They are, at least, the documents upon which alone the canvassers can act. They make the foundation of the abstract, and must necessarily be looked to in determining *how* the abstract should have been made. Records are not the only kinds of primary evidence.

In settling the law, the court in its second declaration 9. Intimidation,&c. made on the part of plaintiff, said: "That in order to impeach and set aside the returns and result as shown by the poll books and certificates of the judges of election, on the ground of intimidation and violence, it must appear from all the facts and circumstances in evidence, to the satisfaction of the court, that there was such a manifestation of intimidation or violence, *as would have influenced men of ordinary firmness*, circumstanced as were the voters; and that, by reason thereof, voters were actually prevented from voting as desired, to such an extent as would have changed the result; or that by reason of it, the true result cannot be ascertained with certainty." And in the third declaration the court adds: "Slight disturbances, at any poll, even sufficient to alarm a few of the more timid, which do not materially affect the result, or render it uncertain, or the freedom of the election, are not sufficient to declare the election void."

The third declaration of the point covered presents a correct view of the law. The second does also, save as to the qualification that the intimidation must be such as would

have influenced men of ordinary firmness.  Unless we take for granted, what cannot readily be admitted, that the timid and nervous class constitute a body of our citizens too small to be estimable, or too insignificant to be protected in the exercise of the right of franchise, we cannot say that they may be deterred from voting, with impunity from consequences, provided the means of intimidation be so carefully chosen as not to affect men of average firmness.  The body of men who shrink from danger and suffering and inconvenience, where they have no direct personal object to be accomplished by incurring them, is sufficiently large, in every community, to make it a temptation to intimidate them, especially in close elections.  Our Constitution does not recognize the policy of the selection of the fittest to exercise the right of franchise.  The true rule is expressed in a former part of this opinion, and was indeed declared by the court on motion of defendant.  It is this, that intimidation will vitiate the poll if it has been sufficiently powerful to change the result, or render it uncertain what the true result would have been without it, regardless of the personal courage of the voters deterred.  Upon no other basis can there be a *free* election.  It will not be contended that the vote of a cowardly and nervous man is less sacred than that of the boldest and firmest, or that intimidation becomes more harmless as it becomes easier.  Where majorities govern, it is important that all should vote freely, and if *any* cannot, it is not they alone who suffer the consequences of their timidity.  All others suffer who look to their free vote for the support of the same candidates or the same policy.  So far as the judgment of the court was influenced by the declaration of law upon this subject, made for the plaintiff, it tended to an erroneous view of the amount and force of evidence required.

This brings us to consider whether or not the findings of the court as to the facts were correct, and if correct, was

Patton v. Coates.

the law properly applied to the judgment? The circuit judge found that in three of the voting precincts there had not been an entirely free and fair election. Two of these, Eastman and Eagle, he excluded from the count as shown by the returns. In the third, which was the sixth ward of Little Rock, he found much to reprehend, which he did in strong language, but he was of the opinion that the fraud and intimidation there, and the illegal votes in other parts of the county, were not sufficient to change the result, or to render it doubtful. The whole vote of the sixth ward was counted without any deduction, which gave the plaintiff an aggregate majority of 118 votes. His Honor conceded that there had been some 40 or 50 illegal votes, but as they would not change the result, it was not considered important to make any further estimate of them.

It is not contended in argument here by appellee that his honor erred in excluding the townships of Eastman and Eagle, nor by appellant that he should have excluded any others save the sixth ward. The appellant does contend that the sixth ward should be wholly excluded, and, also, that if it be admitted, he has proved enough illegal votes in that ward and other parts of the county, taken together, to overcome the majority for appellee.

Disposing first of the latter point, we concur with the circuit judge in finding that as many as one hundred and eighteen illegal votes for the appellee have not been clearly shown. There is, on this point, much proof of a vague and indeterminate character, but it lacks the certainty necessary to purge polls, which have been accepted as not altogether void. It may well be considered, nevertheless, upon the other question, whether it does not contribute to show such fraud or intimidation of an uncertain character, as to cause the poll of the sixth ward to be wholly rejected on account of uncertainty in the result. We will confine ourselves, therefore, to the consideration of the evidence touching the

sixth ward; being either concerning what happened there, or concerning events in other parts of the county, which explain what occurred there; or the influence of which may have reached there. In doing this we cannot ignore what is matter of history and public notoriety, that we have in our midst a distinct class of electors, of a distinct race, who have been newly enfranchised and entitled to full equality in the exercise of the right of suffrage. The transcript discloses the fact that they had, as was their right, acted almost in a body in former elections in the support of the republican party, and that, whether from good reason or not, they esteemed every one of their color who supported the democratic ticket as recreant to his race, and worthy of reprobation, if not punishment. It is not possible, nor wise if practicable, to shut our eyes to this fact, in view of its past consequences and the probabilities of the future. It stares us in the face in every page of this transcript. It does not become a judicial tribunal to say, and we do not presume to say, that they are misguided in this, or that the sentiment is wrong. But the court may *recognize it as existing*, and must take care that it may lead to no illegal courses. Under the protection of the constitution, their right to entertain it can not be gainsaid, nor can their right to act upon it, within legal bounds, be questioned. It further appears that for the general election of 1882, a regular republican list of candidates for state and county officers was put forth, called the "yellow ticket," from the color of the paper on which the ballots were printed. Upon this ticket appeared the name of appellee Coates for county judge, and of Oliver for sheriff, The democrats nominated no ticket; but by concert of action with some republicans, a mixed ticket called "the peoples' ticket" was put forth jointly, containing members of both parties, and of both races. Upon this ticket appeared the name of appellant Patton for county judge, and of Fletcher for sheriff. At the time of the election, Coates and Oliver

Patton v. Coates.

were properly holding, respectively, the offices of judge and sheriff. under the last election.

There is little or no evidence of improper feeling or undue excitement in the county amongst the white people supporting the different tickets, but it became apparent, during the contest, that a bitter feeling had been engendered amongst the great body of colored citizens against such of their number as intended to support, what they called the Fletcher ticket. They were threatened, silenced in public meetings, attacked and beaten, spoken of contemptuously and in a manner, cut off from the sympathy of their own race. Instances of these different kinds of maltreatment are given in evidence : especially a threat from one active colored politician to the effect that after the election the Oliver negroes would go a-gunning after the Fletcher negroes. These threats and this spirit are proven to have been in the townships where the colored population was predominant. Without taking these things into consideration, it is not possible to estimate the full meaning and import of what happened on the day of the election. Nor can the full meaning of what happened that day at the sixth ward be truly apprehended without assistance from the events which occurred at Eastman, Campbell and other townships. The influences brought to bear in the several townships were not isolated, but must be considered as the result of the same spirit and plan of action, operating at different localities with more or less intensity.

The reasons announced by the circuit judge for discarding the polls of Eagle and Eastman townships are well supported by the evidence and are thus expressed. With regard to Eagle, he says ; "That quite a number of illegal votes were cast for plaintiff by non-residents. That in one or two instances, legal voters who had desired to vote for Patton were rejected. That an armed force was around the polls all day. That they were armed with needle guns. rifles

and shot guns, and that those so armed were colored men (with one exception), and supporters of the plaintiff. That these guns were stacked immediately around the polls. That fifty-three men had guns in the afternoon of the day of the election, and that quite a number of them with their guns, accompanied the officers who brought up the returns to the county clerk.''

· With regard to Eastman, he says: ''That early in the morning, even before the polls were opened, a large crowd of colored men, ranging from two hundred to four hundred, surrounded the polls, a large majority of whom were supporters of plaintiff; and by their conduct made it exceedingly difficult for a colored man, desirous of supporting defendant, to deposit his ballot. That supporters of plaintiff would forcibly take their ballots from them, threaten to burn their houses, throw them into the river, turn them out of church, &c., in case they voted for the ticket upon which defendant was a candidate. That, in certain circumstances, voters were so intimidated as either to leave the polls without voting, or had to be conducted to the polls under the protection of white citizens. That one Moore, a colored man, declined to go to the polls because he would not be allowed to vote as he saw fit. That one Andrew Jackson, a resident of Mineral township, presented himself as a voter of Eastman polls and was challenged. That said Jackson told one of the judges (George Scott) that he lived in Mineral township. That notwithstanding this, said Scott allowed him to vote, without swearing him, and without calling the attention of the other judges thereto. That some twelve or fifteen men in one crowd, desiring to vote ''the people's ticket'' were furnished tickets, and in attempting to vote were set upon by a much larger crowd of supporters of plaintiff, their tickets taken from them, and only two voted as they wished.''

A careful review of the evidence satisfies us that his Honor

Patton v. Coates.

in this recapitulation, has not presented the whole of the improper proceedings at either township, which the transcript would have justified. The evidence is voluminous and not easily remembered, all at once. The salient points of it only are recited in these findings—sufficient, however, to justify his exclusion of the poll books, and to throw some light upon the *animus* and design of the proceedings going on contemporaneously at the sixth ward of the city near at hand. His Honor, for the same reason, has fallen short of a full presentation of the facts regarding the sixth ward, although they are correct as far as they go. The evidence with regard to the different polls is much intermingled, and without a more severe analysis and rearrangement than is possible at *nisi prius*, it is almost impossible to group the facts separately in the mind. We have felt impelled by the importance of the questions at issue, to undertake that labor, and find for ourselves regarding the sixth ward, as follows :—

Credible witnesses on the part of defendant say, that a certain Jew peddler was prevented by threats from voting ; that the republicans crowded the window at which votes were taken, and unless a man was firm he would vote the way the crowd wanted him to ; that republican voters got to the window easily through the dense crowd, but it was almost impossible for one with the "people's ticket" to do so. They were "blockaded" and insulted, and various obstacles were interposed to their progress. There seemed to be a general concentration of opposition to the voters of the "people's ticket." Crowds would close up around them, and intimidate them by hooting, etc. This was kept up all day. A rush was made on Isaac Gillem, accompanied with threats, and cries of "d—d negro," "selling out to the democratic party," etc. Eight or ten men with badges, claiming to be deputy sheriffs under Oliver, were there taking part in the intimidation. One of them, armed with a

pistol, told a witness that he could not discuss politics there with those people. An active colored republican, Henry Clay, told the same witness to "go slow," that they proposed to run this election, and parties who went against them had better "sing low." The witness saw a colored man they were about to mistreat in some way, and told him to come with him, whereupon he was told himself that he had better get away, or he would be in danger. Another witness testifies that Gillem was taken off, and that he was pursued across the street to a Methodist church, and that women were put after him. Two or three persons, apparently boys, attempting to vote, were challlenged, and not being able to give their ages, went away. They came afterwards and voted. Many strangers and unknown persons would come up and offer to vote. When challenged they would often be at a loss to tell where they lived. Active republican partizans (colored men) would answer for them, or prompt their answers. One of the challenged parties answered first that he lived on Barraque street, which is in Pine Bluff, but being prompted gave another locality in the ward. The attention of the judges was called to this prompting and they ordered it to stop, but it continued nevertheless, and no one was arrested or removed for persistency. A great many were allowed to vote upon their own statements that they lived in particular parts of the ward, when the statements were false and the judges were so told. One of the judges declared the principle upon which they acted to be that the knowledge of the judges should override all other testimony. Minors were allowed to vote. Those who saw these abuses being perpetrated challenged persistently—they were rebuked for it and considered troublesome—became tired of it and quit. One witness thought that a one hundred and fifty or two hundred non-residents of the ward were allowed to vote. Another witness saw two men prevented from voting the

Patton v. Coates.

"people's ticket." One of them was struck. The same witness says that he was himself assaulted, that he applied to the officers to protect him, and they refused to do so. That boys were around with their knives out. He also saw non-residents and convicts vote, giving their names. Another witness testifies that he saw a great deal of intimi-, dation and violence. He calls it "a reign of terror" all day. There was screaming, swinging of clubs and drawing canes. Whoever would not vote the yellow ticket would be "pushed out." The crowd did everything, except resorting to violence, to prevent persons from voting the people's ticket. He saw a great many tickets snatched out of voters' hands and torn up—as many as 20 or 30 of them, and heard a great deal of abusive and threatening language, such as "no such d—d nigger should live here." Another witness, confirming the prevalence of snatching, threatening and abusing, said, that most of those who desired to vote the people's ticket went away, and a number of others resorted to the expedient of pasting the names of the candidates on the yellow tickets to be able to vote. This witness voted the people's ticket himself, and was not alarmed, but says a great many others were, and gives some of their names. Indeed he says that he saw no one (meaning, we suppose, of the colored race) who went up squarely and openly and voted the people's ticket. Another witness saw a voter who intended voting the people's ticket, treated with violence. He was dragged away and pulled about, and his hat knocked off.

The testimony with regard to the sheriff's deputies, is almost universal amongst defendant's witnesses, to the general effect that they went about with badges and were active partizans for the yellow ticket, contributing rather to prevent than compel a free election. "It required almost a fight," says one, "to get to the polling place." The same witness testified that he overheard a conversation at the

polling place amongst a group of colored men whom he had never seen before, and heard them tell each other that they had come in, some from Pine Bluff, and some from Hot. Springs, and had voted the Oliver ticket. He too says. there was a continuons system of terrorism at the polls all day, and that the threats against those voting the people's ticket were "determined and in anger." He saw a case of actual intimidation from voting, and saw four colored men vote who resided, two of them, in Jefferson county and two in Mississippi.

One witness in particular, John Brodie, who was a challenger for the people's ticket and had excellent opportunities for observation, on account of his proximity to the polls, testifies as to the great number of strangers at the polls whose votes were challenged. He says that some of them were sworn, and in 19 out of 20 cases, the answers would be put into their mouths by the surrounding crowd. He also testifies as to the inadvertant answer of one, made for himself, that he lived on Barraque street. He says, too, that many were allowed to vote without swearing, on exclamations from the crowd around that they were "all right." He corroborates the evidence that men were threatened and hustled away, and their tickets torn up. He testifies to as many as twenty-five who were scared and prevented from voting. He says also, and his evidence in this is corroborated, that a great many white voters left the polls in disgust, without voting. Another witness saw men who had voted at Big Rock, repeating again at sixth ward, where he says the election was entirely a one-sided thing, because the colored population was crowded around the polls, aided by a few white men to control the republican vote, to the exclusion of all others.

It is consoling to turn from this sickening picture to the evidence on the part of the plaintiff, to derive some hope thereby that the foregoing witnesses, none of whom

are impeached, might, some of them, have been deceived by appearances, or have attached undue importance to cries, or declarations, or gestures which had no serious import. Jerome Lewis, who was closely in attendance all day at the polls as a challenger in the republican interest (and whom the other witnesses charge with prompting voters) says that the colored population has increased four or five hundred at that voting precinct, thus accounting for the suspicious increase of the vote. He says he made a canvass of the ward after the election to get the relative strength of the colored vote, taking the names of about 875 or 880 voters to find out where they lived. It seems he did not do so, but found a great many of them had gone off to work, at different places out of town. He says that all the other judges in determining questions gave way to the democratic judge. He says that when he challenged a minor and his father spoke for him, he would always withdraw the challenge. He knew no minor, nor non-resident, who voted. No one around the polls interfered with the people's ticket men. The crowd was thick and they had some difficulty in getting up. That was all; saw no man prevented from getting his ticket in, and no noisy policemen appointed by Oliver. There was one appointed by the mayor. In one point his testimony discloses a somewhat singular view of the freedom of franchise, which may, or may not, be the prevailing sentiment of his race. Using his own language as taken down in the transcript, he says: "We colored men tried to compel colored men to vote as they had claimed to be going to vote, before the election." "All I did, and others did, was to make them vote for the party."

The democratic judge at the polls testified for plaintiff that there was nothing alarming about the election. A woman might have voted. Still there was some things he did not like. Especially that thing of others answering for challenged voters, and putting words in their mouths, in

which he says that Jerome Lewis with others was engaged. He protested against that. Can't say how often it occurred. Generally, he says, the judges were always satisfied that a voter was qualified, but in the special cases of four or five minors and one or two non-residents, he yet thinks, himself, that they were incompetent. "It occasionally occurred," he says, "that parties would be at a loss as to where they lived, *until prompted, and when prompted they usually adopted the suggestions made.*" A great many challenged votes were settled on the personal knowledge of the judges, which "ranked the opinion of the challengers." He says a list was kept of 48 persons who were challenged and voted, but no list was kept of those rejected. Of those accepted and voting on the personal knowledge of a judge, one of his republican associates knew more than either of the others, although he vouched for some himself. He saw no intimidation. Brodie made more trouble than any one else, that is by being loud. He does not think there was ten minutes interruption all day, although threats might have been made.

Another witness says he saw no one prevented from voting as he pleased, but says with great *naivete* that he himself took a ticket away from a colored voter, which had been pasted—when he knew the voter wanted to vote the republican ticket, straight. Being asked on cross-examination how he knew that, he said he just *thought* he wanted to vote the republican ticket *because he was black*.

There is a considerable number of unimpeached, and as we think, highly creditable witnesses, who testify that they saw no violence or disturbance at the polls, nor anything of an objectionable character ; that there was only the usual crowding at elections, and that some of the incidents testified to on the other side, were at the worst only good natured and boisterous fun.

The vote in the sixth ward stood for plaintiff 809, for

defendant 347, an aggregate of 1156. The aggregate vote of
the ward had been in previous elections as follows : 701
votes in 1876, 604 votes in 1878, and 745 votes in 1880.
This shows an increase of more than 55 per cent. in two
years, over the largest vote ever previously cast.   In expla-
nation of that it appears, however, that since the last previ-
ous election a part of an adjacent township ( Big Rock) had
been taken off, and added to the second and sixth wards of the
city.   In order, then, to form some estimate of the real
increase of the vote, it is necessary to take the aggregate of
the three townships or wards, which altogether embrace the
same territory as formerly.   This aggregate in 1880, the
fullest of previous elections, was 1517.   In the election in
question it was 2224, an increase of over 46 per cent.   Big
Rock itself in 1880 had polled 488 votes.   In 1882, after
its contraction, it polls an aggregate of 571, showing still
an increase of over 17 per cent.  It follows that the increased
vote in the sixth ward must have resulted from other
causes than the mere transfer of inhabited territory from
Big Rock.   There is *some*, though very unsatisfactory, evi-
dence that there had been a large influx of population,
which, to some extent, is doubtless true.   Whether or not
the increased vote from its extent, indicated fraudulent vot-
ing, is a matter proper for consideration in connection with
other manifestations of fraud, just as the transactions and
words on the Varner platform should be, or the conversa-
tions overheard by the witness at the polls, regarding "Pine
Bluff" and "Hot Springs."

The negative evidence of plaintiff's witnesses, as to what
they did not see, although to be taken into consideration,
does not, if believed, discredit the positive testimony of
others, as to violence, intimidation, and fraudulent voting.
The crowd itself may have been noticed under different cir-
cumstances, and things coming under the observation of
some may not have been seen by others. It must be remem-

bered, too, that it is not mere noise and disorderly con-
duct which is relied upon as vitiating the election. There
is always much of that, and generally it is harmless, if not
in good taste. The acts and gestures are effective in pro-
portion to their apparent earnestness, and the power to put
them in execution. They need not be loud or demonstra-
tive. Fraudulent voting is carried on generally by the most
quiet methods. Taking the evidence altogether, it cannot
well be doubted that there was coercive, improper and sys-
tematic obstruction of voters of the minority, intimidation
and fraudulent introduction of improper votes.

We think his Honor erred in the extent to which he sup-
posed the improper practice should be carried before the
election at that poll could be declared invalid. This is partly
indicated in the declaration of law which he made, to the
effect that the intimidation must be such as to deter men of
ordinary firmness. It is further indicated in his treatment
of the fraudulent votes, of which he made no accurate esti-
mate for deduction, on the ground that those proven to have
been cast, at the *highest* estimate could not alter the result.
This was not really responsive to the true issue. The ques-
tion on this point was whether or not there had been shown
such a combination, design, and plan for the introduction of
fraudulent votes, as to put it in doubt; whether without the
*prevalence of the plan*, the result would have been different,
not whether fraudulent votes were *shown* sufficient to that
end. Of course under such a fraudulent combination it is
to be expected that many votes would get in which could
not be traced, or might not be observed. It is the *fraud*
that vitiates, not the *count* that changes, in such cases.
There was another issue collateral to that, concerning coer-
cion and interference with the free will of the actual voters,
and the result of *all combined* should have been considered.

We are satisfied from the evidence, that there was, on the
part of the great body of colored voters, throughout the

county, a sentiment, and a determination if possible to enforce it, that it was wrong in any one of their race to vote "the people's ticket," upon which the defendant was a candidate.

That, misled by an erroneous sense of political duty, or misguided by designing men (who were not either of the candidates in this contest), they resorted to threats, intimidation and fraudulent introduction of fraudulent colored voters as the proper agencies to accomplish the objects in view, and that those agencies were exercised in all the townships, where the great preponderance of colored voters rendered them practical and most likely to be effectual; and these agencies, where effectual, destroyed the freedom of the election in the sense in which it is guaranteed by the constitution. We do not mean to hold that the most forcible appeals to the judgment, the heart, or the reason of electors; nor any means of exciting their enthusiasm; nor appeals to race pride, or race interests; nor even threats of social ostracism, and loss of business support, however ungenerous or reprehensible in ethics, or however widely extended, can be considered as interfering with the freedom of electors in the constitutional sense. Every man's hand, like that of Douglas, is his own, and he may give or withhold it, with his respect and business patronage, to or from whom he pleases. The intimidation which the constitution forbids, is that which induces a fear of the violation of one's rights of person, or property, or tranquility of residence at home.

We think the effect of these agencies of fraud and intimidation were such at the sixth ward election as to render it very uncertain whether or not, without them, the plaintiff would have received 118 votes of the majority counted for him there, and if he had not he would not have been elected. The doubt must be resolved against the party here, whose friends perpetrated the wrong, and that upon every sound

Patton v. Coates.

. principle of law, equity and political ethics.    Otherwise all parties at elections will be tempted to resort to like measures.

Having this view, we think his Honor, the circuit judge, properly excluded the townships of Eastman and Eagle. We think he was mistaken in his estimate of the effect of the same improper influences in the sixth ward, and that he should have excluded that also, and that he might have done so, but for the view which he expressed, that it was necessary that the intimidation should have been of a character to affect men of firmness.    The evidence, indeed, seems that firm and undaunted men *could* vote as they pleased, by the exercise of firmness and persistency, whilst many more timid or adverse to strife, were deterred.    The vote of the principal body of the county, being still retained, the election would not, by the exclusion of the sixth ward, be avoided in the whole county; but Patton would have appeared still entitled to hold the office for which he was, at first, certainly, improperly commissioned—or rather on false grounds,

It is questionable whether the courts, under a delicate desire to conform to the full emancipation and enfranchisement of the former slaves, have acted wisely in ignoring all differences and distinction of race whatever. The actual facts are too subborn.    The colored people are a class of electors new to the privileges of free and equal citizenship, and untutored in their exercise.    This entire freedom and political equality is now theirs forever, and must be sacredly protected.    Their former condition requires of us patience, kindness, and, as far as consists with safety, toleration of their errors and mistakes.    But the peace of society, and the very existence of our government, demands all classes speedily to learn that freedom is not unbridled license; and that their own liberties are only safe so long as they, as a body, respect the equal liberty of all others

Patton v. Coates.

of their own race or any other. That they may vote, each as he pleases, for any man of any party or color, and no power in the government has the right to say him nay or punish him unlawfully. But he must accord the same personal privilege to every one of his own race. The courts should not only be stern and inflexible in protecting them as the weaker, and, as yet, less educated class of electors, against invasion of their rights by the whites, but should be equally firm in repressing all efforts amongst them to coerce the political conduct of each other, or to seek the success of what they suppose to be race interests by illegal voting, or repeating, or unlawful measures for enforcing solidity.

When the time comes when no unqualified voter dare approach the polls, and when every qualified voter may do so peaceably, quietly and without further question or obstruction than may be necessary to show his qualification, without fear of or responsibility to any other voter or body of voters, white or black, the object of the constitution, and the highest desire of every true patriot will be fulfilled. They never will be if this election is allowed to stand as a successful precedent. These questions now come before us for the first time, and have afforded no little anxiety. But we have resolved to face them thoroughly and frankly, and lay down *in limine* the principles by which the conduct of elections must be guided.

We think his Honor, the circuit judge, erred in excluding the evidence of conversations at Varner—in declaring the law to be that the intimidation to be fraudulent must be such as would affect men of ordinary firmness; in finding that the fraud and intimidation at the polls of the sixth ward was not sufficient to render the result uncertain; and in declaring the appellee, Coats, elected.

Reverse the judgment and remand the cause for a new trial.

Patton v. Coates.

DISSENTING

SMITH, JUSTICE. I think Coates was elected. If all the voting precincts were counted, he had a majority of 637 votes. The circuit court, for cause, excluded from the computation Eagle and Eastman; and the propriety of his decision in regard to these two townships is not before us, the error, if any there was, being in favor of the appellant. This reduced Coates' majority to 118. Some illegal votes were cast by minors, by convicts and by non-residents, but not a sufficient number of these is proved to affect the result.

The case thus hinges upon the vote of the sixth ward in the city of Little Rock: counting that, Coates is elected; throwing it out elects Patton.

The suggestion that the vote of that ward ought to be suppressed for frauds committed by the judges of election, is not worthy of serious consideration. They might, with advantage to the public, have exercised their authority a little more firmly by requiring challenged voters to answer questions touching their qualifications, without prompting from by-standers. But the record shows an honest effort on the part of these judges to hold a fair election, and any errors they may have fallen into were errors of judgment which would not vitiate the entire poll.

Then the ward must be excluded, if at all, on account of threats, violence and intimidation used by the supporters of the ticket upon which Coates was running. Many disgraceful scenes were enacted in that ward on election day. Tickets were snatched out of the hands of colored voters who proposed to vote the people's ticket; they were hustled at the polls and threats were made by other colored men and lads that they should be turned out of the church; that they should not be suffered to reside in the ward, and that they should be beaten, thrown into the river, and otherwise maltreated if they persisted in their course. And the deputy sheriffs, who were in attendance, appear to have been far

more solicitous to advance the interest of their principal, who was a candidate for re-election, than to preserve order and to guarantee the electors the exercise of their legal rights. Nevertheless, the question whether there was in this ward a free and equal election was one mainly of fact; the declarations of law showing in the circuit judge a clear conception of what constituted a fair election. And for the proper determination of this question of fact, the circuit court, which had the witnesses before it, and could observe their appearance, demeanor and manner of testifying, was much better qualified than any appellate tribunal.

For these reasons I am in favor of affirming the judgment of the court below.