FRANK A. DEAN v. STATE OF NEBRASKA, EX REL. J. THEODORE MILLER.

FILED OCTOBER 5, 1898.    No. 8298.

1. **Quo Warranto: REVIEW: EXPIRATION OF TERM OF OFFICE.** A proceeding in quo warranto, brought by a claimant to the office, will not be dismissed or a review thereof denied, because, pending the review of the case in this court, the term of office has expired, the office being a lucrative one.

2. **Elections: CONTESTS: EVIDENCE.** In a judicial proceeding to test the validity or result of an election, where it has been shown that illegal votes were cast, testimony cannot be received of declarations made by the illegal voters as to the nature of the votes by them cast, unless such declarations are strictly a part of the *res gestæ* or fall within some recognized exception to the rule excluding hearsay evidence.

ERROR from the district court of Phelps county. Tried below before BEALL, J.    *Reversed.*

*G. Norberg* and *James I. Rhea,* for plaintiff in error.

*A. J. Shafer* and *Stewart & Munger, contra.*

IRVINE, C.

At the municipal election held in April, 1895, at Holdrege, a city of the second class, J. Theodore Miller and L. J. Titus were the candidates for the mayor. When the votes were canvassed it was found that each candidate had received 215 votes, and the council declared that there was a tie and that neither candidate had been elected. Thereupon Dean, the then incumbent, qualified as an officer holding over his term until his successor should be chosen and qualified. Miller took the oath of office and instituted this proceeding in quo warranto against Dean. The substantive issue was whether Miller

had been elected, he charging that certain illegal votes had been cast and counted for Titus, and with these rejected that Miller had received a majority. These allegations were denied by Dean, who in turn charged irregularities and illegal voting vitiating the election. The district court found generally for the relator and entered a judgment of ouster against Dean and an order that Miller be installed.

Of the questions discussed that naturally first presenting itself for decision is whether this court will review the proceedings of the district court at this time, it appearing that the term of office in controversy has expired. It is insisted that the case therefore falls within the rule followed by many courts, that when no effective judgment can be rendered except for costs a case will be denied further consideration. This was not a proceeding by the public prosecutor to oust an usurper, but one by a rival claimant to the office, a judgment in which would be necessary to adjudicate the title to the office as between the parties. We must assume that the office in dispute is a lucrative office. While the statute does not fix the salary of mayor, it directs that the mayor and other officers named shall receive salaries to be fixed by ordinance, and itself fixes a maximum. (Compiled Statutes, ch. 14, art. 1. sec. 7.) An adjudication of the title, in a proper proceeding, is essential to establish the rights of the parties to the emoluments. This is a property right, and cannot be denied because the delay occasioned by the crowded condition of our docket has rendered the active part of the judgment ineffective. (*Hunter v. Chandler*, 45 Mo. 452.)

There was sufficient evidence to show that at least one, perhaps three, of those voting at the election had abandoned their residence in Holdrege prior thereto, but the only evidence that any of these votes was cast for Titus consists in the testimony of third persons as to declarations of these voters as to the nature of their votes. Some of these declarations were made prior to the casting

of the votes and were expressions of intention; the others were made subsequent to voting. In one or two instances the declarations were made the day on which the election took place, but none was made to an election officer, none was made at the polls or at the time of voting, and none was connected with any principal fact pertinent to the issue and explanatory of such fact. In other words, none was a part of the *res gestæ* determined by the ordinary rules. We have thus presented, and we think for the first time, the question whether such declarations are competent evidence to show the character of the illegal vote. It is generally said that the practice of legislative bodies is to receive such evidence, but an investigation has disclosed that neither in parliament nor in congress has such practice been uniform. The congressional cases have been so inconsistent that they cannot be said to establish a rule. The question received much attention from the committee in *Wallace v. McKinley*, Mobley [Digest of Contested Elections] 185. The majority, for reasons based on principle, recommended the rejection of the evidence; while the minority recommended its reception for the reason that in legislative bodies the practice was to do so. As to the distinction between courts and legislative bodies suggested by the minority, the language of Judge Campbell, in *People v. Cicott*, 16 Mich. 283, is very pertinent: "The course adopted by legislative bodies cannot be regarded as a safe guide for courts of justice. * * * The view taken of contested elections by these popular bodies is not always accurate or consistent with any settled principles." An examination of the reports of contested congressional elections in connection with the party affiliations of the claimants and of the members of the committees lends much weight to the remark that the course of such bodies cannot be regarded as a safe guide for courts of justice.

The judicial cases have more frequently turned on the admissibility of evidence of declarations regarding the qualifications of the voters than the nature of their votes;

but a precedent against the former class of declarations is, *a fortiori*, a precedent against the latter. As to residence, and sometimes as to other elements affecting qualifications, intention is a factor, and must largely be gathered from conduct, including spoken words. On the other hand, it is the policy of this country to protect the secrecy of the ballot. The voter cannot be compelled to disclose the nature of his vote, and, as said in one of the cases, the protection thus given him implies the right to deceive a prying neighbor who tries to learn his secret. And, as it has also been said in one of the cases we shall cite, it would be useless to protect the voter from disclosing the nature of his vote, if at the same time there should be encouraged a system of extrajudicial espionage to discover the secret. The competency of such evidence has been denied in strong, and, to our minds, conclusive, opinions in *People v. Cicott, supra, People v. Commissioners,* 7 Colo. 190, and *Gilleland v. Schuyler,* 9 Kan. 569. It has been affirmed in *People v. Pease,* 27 N. Y. 45, and in *State v. Olin,* 23 Wis. 319. In the New York case the court held the evidence admissible because such was conceived to be the practice of legislative bodies, and the court could not see why the courts should adopt a different rule. The recent tendency of legislation to throw contested elections into the courts shows that legislative bodies themselves have seen that the course adopted by them in such matters is not a safe guide. Perhaps the willingness of the New York court to follow legislative precedents accounts for the further remarkable holding in the case cited, that while a voter cannot be compelled to testify for whom he voted, he may be compelled to testify for whom he intended to vote when he went to the polls, and this as a means of ascertaining for whom he did vote. In the Wisconsin case there is no discussion of the question. The New York case is cited and it is said to be the established rule to admit such evidence. The character of these cases quite justifies their curt disapproval by Judge Brewer in *Gilleland v. Schuyler, supra.*

The reasons given for admitting such proof are in some instances that every voter is a party to a contest, and in others that it is a part of the *res gestœ*. The first reason is obviously a sham one founded on a groundless and inexcusable fiction. The second reason is a sound one when the facts justify it. Thus, in *Beardstown v. Virginia*, 81 Ill. 541, subsequent declarations were held inadmissible, but those made as to the voter's disqualification, as a reason for not voting when he was sought after to vote, were received. Perhaps the application of the rule of *res gestœ* was there a little extended, but the decision in principle, apart from its application to the facts, was certainly sound. So in *Patton v. Coates*, 41 Ark. 111, declarations were admitted of a crowd of negroes returning from a county in which the election was held to the county of their residence. These were declarations as to how they had voted, coupled with a display of marked ballots. The court there said that such declarations could not be received for the purpose of rejecting the votes, but that they were competent to show a conspiracy to control the election by fraud in favor of a certain interest—this on the principle announced in the case of Lord George Gordon, whereby the cries of a mob are received to show its object.

We conclude that in such cases as the present the established rules of evidence must be applied, and that these require the rejection of declarations of voters as to how they voted, as being hearsay, unless they be strictly a part of the *res gestœ* or fall within some other recognized exception to the rule excluding hearsay. When we thus disregard the evidence of declarations in this case, there is nothing left to show that any illegal votes were cast for Titus. The other phases of the case need not be considered. The election, in the aspect most favorable to Miller, resulted in a tie. No steps to dissolve the tie were taken, Dean's successor had not been chosen, and he was the rightful incumbent.

REVERSED AND REMANDED.