ABSHIER et al. v. AIKEN et al. (No. 183.)

(Court of Civil Appeals of Texas. Beaumont. Dec. 8, 1916.)

1. ELECTIONS ⬩295(1)—CONTEST—EVIDENCE.
Evidence in election contest *held* to show that a voter was deterred from voting by talk as to his having trouble if he voted and an opinion of the county attorney as to voting rights.
[Ed. Note.—For other cases, see Elections, Cent. Dig. § 297; Dec. Dig. ⬩295(1).]

2. ELECTIONS ⬩238 — RESTRAINT OF VOTER FROM VOTING—EFFECT.
Where a voter was restrained from voting by threatening talk and an adverse opinion on his voting rights by the county attorney, and his vote would have tied the result as between two candidates, the vote as between these candidates should be determined a tie.
[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 216, 217; Dec. Dig. ⬩238.]

3. ELECTIONS ⬩295(1)—CONTEST—EVIDENCE.
Evidence in election contest *held* to show that a certain voter was neither influenced by intimidation nor an adverse opinion by the county attorney on his voting rights.
[Ed. Note.—For other cases, see Elections, Cent. Dig. § 297; Dec. Dig. ⬩295(1).]

4. ELECTIONS ⬩295(1)—RESIDENCE OF VOTER —EVIDENCE.
Evidence in election contest *held* not to show conclusively that a voter did not live and pay his poll tax in the county in which he voted.
[Ed. Note.—For other cases, see Elections, Cent. Dig. § 297; Dec. Dig. ⬩295(1).]

Appeal from District Court, Liberty County; J. Llewellyn, Judge.

Election contest by H. C. Abshier and others against Jesse Aiken and others. Judgment for contestees, and contestants appeal. Reformed and affirmed.

Stevens & Stevens, of Houston, for appellants. C. H. Cain and E. B. Pickett, Jr., both of Liberty, for appellees.

BROOKE, J. This suit was instituted by H. C. Abshier, Nicholas Schmitz, and Dr. H. C. Smith to contest an election for drainage commissioners in and for drainage district No. 2, Liberty county, held upon the 25th day of March, A. D. 1916. The contestants alleged in their first amended original notice of contest and in their trial amendment: That said drainage district had been duly and legally constituted, and that, according to the returns of the election as canvassed by the commissioners'

court, the vote was as follows: J. H. Suttles, 19 votes; Jesse Aiken, 13 votes; Geo. Parker, 13 votes; Nicholas Schmitz, 12 votes; H. C. Abshier, 12 votes; H. C. Smith, 11 votes. That H. A. Hotchkiss, who voted for each of the contestees, was not a qualified voter, because he should have paid his poll tax in Montgomery county, and for the further reason that he had not resided in Liberty county for six months preceding the election. That Chester Carson and ——— Eastman and Newt Tucker, who were qualified voting taxpayers in said district, but who owned no real estate therein, were intimidated from voting on account of threats offered by certain persons in the election booth and around said election booth, who threatened to prosecute such parties upon charges of illegal voting for the reason that they did not own real estate within said drainage district, and for the further reason that Mr. C. H. Cain, the county attorney of Liberty county, had issued an opinion upon the law governing the right of suffrage in the matter of the election of drainage commissioners, which opinion held that no electors other than those who owned real estate within such district were qualified and legal voters. It was further alleged that the said Carson, Eastman, and Tucker, had they voted at said election, would have voted for said contestants. The contestees denied specifically the allegations of the contestants, and by trial amendment alleged that H. C. Smith, one of the contestants, who voted for all of the contestants, was not a qualified voter in said district, for the reason that he resided without said district.

. The court held that the contestees have been duly elected, and judgment was accordingly entered to that effect. A motion for a new trial was filed by the contestants, which, in addition to errors of law upon the part of the trial court, set up certain newly discovered evidence, which set forth that J. H. Suttles, one of the contestees, and who voted for the contestees, was not a qualified voter in said district, in that he should have paid his poll tax in Jefferson county, where he resided on the 1st day of January, A. D. 1915. The motion for a new trial was overruled, and the case has been appealed to this court.

The first assignment of error is as follows:

"The undisputed evidence having shown that Chester Carson, a qualified voter in said drainage district, a short time prior to the election applied to Hon. C. H. Cain, county attorney of Liberty county, for an opinion as to whether or not it is necessary for an elector in said drainage district to vote at said election, which is now being contested, in order to be qualified to vote should be required to own real estate in said district, the said Chester Carson only owning taxable personal property in said district, and it appearing further from the evidence that said Hon. C. H. Cain, county attorney of Liberty county, gave a written opinion to said Chester Carson, wherein he was advised that only those persons being freeholders in said district were qualified voters at said election, which opinion of said Hon. C. H. Cain is here-

to attached and marked Exhibit A, and the evidence having further shown that the said Chester Carson, on account of the opinion of said Hon. C. H. Cain, and on account of certain threats of prosecution by certain parties actively aligned with contestees in this cause, should he vote in said election, while not being a freeholder taxpayer therein, refrained from voting, and the evidence having further shown that said Chester Carson, had he been permitted to vote, would have voted for H. C. Abshier, J. H. Suttles, and Geo. Parker, and the court erred in holding that said contestant, H. C. Abshier, had been deprived of a vote, which would have tied the vote of the said H. C. Abshier with the said Jesse Aiken, one of the contestees, the undisputed evidence having shown that Newt Tucker, a qualified freeholder taxpayer and voter in said drainage district would have voted for the contestants in said election had he been permitted to vote, but that he was deterred from voting by threats of prosecution against himself on account of the fact that he was not a freehold taxpayer in said drainage district, hence the court erred in not setting aside said election, and holding that there would have been a tie vote as to the contestants H. C. Abshier and Nicholas Schmitz."

The opinion which Mr. C. H. Cain furnished as to the qualification of voters for the election of drainage commissioners is as follows:

"Drainage Commissioner's Qualifications—How Elected—Qualified Voters, etc.

"Article 2585, Vernon's Sayles' Texas Civil Statutes 1914, provides: 'After the establishment of any drainage district as herein provided, the commissioners' court shall appoint three drainage commissioners, all of whom shall be residents of the proposed drainage district, who shall be freehold taxpayers and legal voters of the county, whose duty shall be as hereinafter provided, and who shall each receive for their services a sum of not more than two dollars and fifty cents per day for the time actually engaged in the work of said district: Provided, the compensation (if any) shall have been definitely fixed in the order of the court; and before any amount shall be paid said commissioners, or either of them, they shall make a detailed report to the commissioners' court of the time actually consumed in the work for said district, and of the work done, and such report shall be audited and approved by the commissioners' court. Said drainage commissioners shall hold office for the term of two years and until their successors have qualified, unless sooner removed by a majority vote of the county commissioners for malfeasance * * * in office. Upon expiration of the term of office of said drainage commissioners or in case of the resignation of any such commissioners the commissioners' court shall appoint their successors by a majority vote: Provided, that after the election establishing a drainage district, if a majority of the real property taxpayers of such district residing in such county, present a petition to the county commissioners' court, praying for an election in said district for the purpose of electing three drainage commissioners therefor, the county commissioners' court shall immediately order an election to be held in said district for said purpose at the earliest legal time, and an election shall be held and the returns thereof made as hereinbefore provided for other elections, and the same qualifications hereinbefore provided for voting at other elections shall apply in said election. The commissioners' court shall canvass said returns and declare the results at their next regular or special session, and the three persons receiving the highest number of votes shall be declared elected. In the event the third highest vote be tied, the commissioners' court shall elect the third drainage commissioner from among those receiving the third highest vote.

Such commissioners so elected when duly qualified as required by this Act, shall be the legal and rightful drainage commissioners for such district within the full meaning, intent and purpose of this law. All drainage district commissioners elected as herein provided shall hold their offices until the next regular election for state and county officers, and shall then and thereafter be elected every two years at such general election.'

"It is apparent and conclusive, therefore, that to be legally qualified to hold the office as drainage commissioner, one must be a qualified voter in said district; must be a freehold taxpayer, meaning thereby that he must be a 'resident taxpayer.' Now it is not clear (though it seems to be intended that all voters in said drainage district should be real property taxpayers) as to whether or not one should be a real property taxpayer to vote for such commissioners, but I take it, and so understand the law to be, that a resident taxpayer in said district is qualified to vote for such commissioners if he is otherwise qualified. Article 2581 so provides: 'Every person who offers to vote in any election held under the provisions of this act, shall first take the following oath before the presiding judge of the polling place wherein he offers to vote, and the presiding judge is hereby authorized to administer same: "I do solemnly swear (or affirm) that I am a qualified voter of (Liberty) county, and that I am a resident property taxpayer of the proposed drainage district voted on at this election, and I have not voted before at this election." '

"It follows, therefore, that one can vote on this question if he is a resident property taxpayer. It seems and is clear that one should live in the district strictly, and be a freehold taxpayer and a qualified voter in said district; in other words, he must come strictly within the bounds of such district strictly before he can become a commissioner of said district.

"Respectfully submitted.

"C. H. Cain, County Attorney."

There is no question but that the opinion of the county attorney was more or less confusing, in that, after saying that "it seems to be intended that all voters in said drainage district should be real property taxpayers," he goes on to say that "he takes it and understands the law to be that a resident taxpayer in said district is qualified to vote for such commissioner if he is otherwise qualified," and the opinion is possibly not as clear as it might be. The testimony shows that the presiding officer of the election, as was his duty, read the oath to each person offering to vote, but that he did not read the opinion of the county attorney to each person who offered to vote. It was, however, discussed on the outside of the polls, and there seemed to be in the minds of some persons some doubt as to what the county attorney really construed the law to be on the subject of the qualification of a voter. However, we will attempt to ascertain from the testimony of the parties alleged to have been intimidated what moved or prevented them from voting.

Chester Carson testified:

"I live at Raywood, and have lived there for about 12 years, and live in this drainage district; have personal property there, horses and cows and things like that, and household goods, and I pay taxes on them; did pay taxes on them last year and this year. On the 25th of March of this year I was helping to hold the other election there at Raywood. There was a different polling place for that from the drainage commissioners' election. I left the election place that I was helping at and went down to the other one, and they told me that I didn't have no right to vote; that I didn't own any land. They were all over the street talking to different people, and I didn't know whether I had a right to vote or not, and I went down there to vote, and after I got there they told me I had better not vote; some of them said I would be perjuring myself. I don't just remember who it was said that, but think Mr. Cardiff said it for one. He was on the outside of the election booth, right near it. There was a whole bunch of them standing right around the door. He didn't tell me that right at the election booth. He was talking to a bunch right close to where the hog law election was, and said that a man didn't have land wasn't entitled to a vote, and he believed that if they did vote they would perjure themselves. That was to vote for drainage commissioners. Mr. Suttles, who is one of the candidates, is a son-in-law of Mr. Cardiff's, and Mr. Cardiff was supporting Mr. Suttles for the office of drainage commissioner. I would have voted if they had not said that; if I had not been afraid to vote, I would have voted. I received an opinion from Mr. Cain, but I didn't understand it thoroughly. Had I voted, I would have voted for Mr. H. C. Abshier. I would have voted for Mr. Suttles also, and Mr. Cardiff and Mr. Suttles knew it; I told them both I would vote for Mr. Suttles. I would have voted for Mr. Parker also. They are two of the men that have been elected as drainage commissioner, and my third man would have been Abshier. I got the opinion from the county attorney, but I didn't understand whether I was entitled to vote by not owning land or not, and was a little bit afraid to take the chance of voting; didn't want to get into trouble. We had had several discussions about it before the day of the election even, that a man had to own land to be entitled to vote. Mr. Cardiff is the man that I heard say that on the day of the election. He was talking up there near the hog law election booth where I was one of the officers, and from that I wasn't thoroughly satisfied that I had a right to vote. I went down to the other election booth to vote about 5 o'clock. I went in, and just at that moment Mr. Conklin, who was the presiding judge, stepped out, and I stepped out, too. I suppose if he had been in there I would have probably voted at that time, but after I got to thinking about it again I changed and went back up to the hog law election. Nobody on the inside of the booth threatened me about my right to vote, and no one challenged my right to vote. When I went in to vote, Mr. Conklin was absent, and I didn't vote because I wanted to see the oath. I saw the oath. No one inside the booth told me that there was a probability of having to pay a penalty for having taken that oath, but one party outside asked me if I was going to vote, and I told him I was undecided, and he told me he didn't believe he would because he didn't want to see me get into any trouble. That man's name was Jesse Aiken. He said he didn't want to see me get into any trouble. That was in about 15 feet of the polling place. I had already been in the polling place and come out when he told me that, but I hadn't give up my mind of voting. I never did go back and consult the judge of the election. I had gotten the county attorney's opinion, but couldn't satisfy myself from that that I had a right to vote. When I went into the place to vote nobody challenged my right to vote and no one interposed any objection to my voting. And after I walked out of there I never returned. That was the only time I went to the polling place while this election was being held. Yes, sir; I can read and write. Am 40 years old. I am over 21 years old and paid my poll tax in

Liberty county, Tex. Jesse Aiken is the man that advised me not to vote. He told me that he didn't want to see me get into any trouble, and was afraid if I voted that I would get into trouble about it."

Newton Tucker testified as follows:

"I live at Raywood, and have lived there this last time about four years. I live in the drainage district, and also live in the hog law district. The hog law district took in part of the territory that the drainage district did, but not all of it. We had two elections on the same day, and I came up from below where I was working, came up in the evening to vote, and went to the election that was about the hog law and voted, and went on over where they were holding the other election and lounged around there, and never tried to vote, for the reason that I understood I couldn't vote for the simple reason that I had no land in the drainage district. I couldn't tell you who told me that, but I heard it there in the street; it was talked that a man that didn't have no land in the district had no right to vote. It was said that a man that voted under those circumstances would be guilty of perjury and would be prosecuted to the full extent of the law. I didn't have any land in the drainage district; it missed the land that I own. I had household goods and such as that, but had no stock no more than a dog, and I wasn't paying taxes on him. I paid taxes on my household goods. I owned some land that was in the hog law district, and I voted in that election. The talk I heard there kept me from trying to vote in the commissioners' election because I knew if I tried to vote I would be challenged. The way I understood it I had no right to vote unless I owned real estate in the district, and of course there was no use to go and make application for a ballot. If I had voted my preference would have been for Dr. Smith, Cameron Abshier, and Mr. Schmitz. Those are the ones I would have voted for. I didn't even go to the polls, because I had heard this talk, and didn't want to make application for a ballot. I heard that talk even before I came to Raywood that evening. I never did come to town and ask the county attorney or the county judge's opinion about it, and I never read the county attorney's opinion that they had out there; never went in the election booth and asked the presiding judge what the oath was, and never read the oath, and I never inquired of any friends as to what the oath was. I just heard it discussed there that to vote I would have to own some property in the district, and that was my understanding. Nobody intimidated or threatened me, and I never give them a chance to challenge my vote. I decided that if that was the case I had no vote coming and didn't try to vote. I don't remember who I heard make the statement that I had to own land to vote, but it was kinder common talk. I never had any horses or cows or anything like that, just had household furniture, and it is worth about 15 cents. I paid my poll tax. I don't know whether any of them talked about the county attorney having written an opinion to the effect that you had to own land before you could vote; don't know whether they talked about that before the election or not, because I was away from home all the time only Saturday night and a part of Sunday, and I didn't get onto what may have been talked. I didn't hear anything about his opinion at all that I know of before the election."

Mr. J. C. Aiken, one of the contestees, testified that he agreed with Chester Carson that the latter was not a qualified voter, and that he stated to Carson he would not lay himself liable for any friend.

Mr. C. W. Cardiff, witness for the contestees, testified that his construction of the county attorney's opinion was that the elector had to own land in the district before he could vote, and that that seemed to be the opinion that everybody placed upon said opinion, and further testified that Chester Carson told the witness that he (Carson) could not vote on account of said opinion of the county attorney.

[1] From the above it is clear to our minds that Mr. Carson was an honest, conscientious citizen, and intended to vote for Mr. Abshier, but was deterred by the talk, among others, of Mr. Aiken, one of the contestees, as to having trouble if he voted, and the general opinion expressed upon the ground by those who came to vote as to what the county attorney really held the law to be, and perhaps from the fact that after reading the county attorney's opinion he was not able to assure himself from his language that, not owning real estate in the drainage district, he was not rightfully entitled to vote therein. If he had voted for Mr. Abshier, as was evidently his intention, the vote between Abshier and Aiken would have tied.

In the case of Hodge v. Jones, 17 Tex. Civ. App. 511, 43 S. W. 43, Judge Key delivering the opinion, the following language is used:

"The testimony fails to show that any of the officers or managers of the election were connected with, or in any wise responsible for, the riotous conduct at Hearne, and it may be that the case does not fall within the strict meaning of the statute; but, without regard to the statute, we are of the opinion that the action of the court in declaring the election null and void is sustained by the common law on the subject. That law is announced by a text-writer in the following language: 'If it clearly appear that the fairness, purity, or freedom of an election has been materially interfered with by acts of violence, intimidation, or armed interference, such election should be set aside. Slight disturbances frequently occur, and are often sufficient to alarm a few of the more timid, without materially affecting the result or the freedom of the election. The true rule is this: The violence or intimidation should be shown to have been sufficient either to change the result, or that, by reason of it, the true result cannot be ascertained with certainty from the returns. To vacate an election on this ground, if the election were not in fact arrested, it must clearly appear that there was such a display of force as ought to have intimidated men of ordinary firmness.'"

In Am. & Eng. Enc. of Law (2d Ed.) vol. 10, p 776, the following is said:

"It is an old adage of the common law that elections should be free; and anything which prevents the free exercise of the right of suffrage by the qualified electors will be a sufficient ground for setting aside an election in any country or state where the rules of the common law prevail. When persons are prevented by force from casting their ballots, it cannot be said that there has been an election, although there may have been the form of one; and the people should not be bound by such a proceeding."

On page 777 the following language is used:

"It is not every disturbance or breach of the peace in the election district, or at the polls, on the day of election, that will be considered as

sufficient to set aside the election on the ground of violence or intimidation. The violence or menace must be of such a character that a man of ordinary firmness would be deterred from attempting to vote, and the time and circumstances of its exercise must have been such as to render it highly probable that the result was rendered uncertain. The precise degree of violence or intimidation required to avoid the election is difficult to determine, as much depends upon the circumstances of each particular case, the habits of society, and the character of the ordinary gatherings of the people. * * * In England it would seem that a less degree of violence will be sufficient to set aside the election, where it is shown that it was instigated by the candidate or his agent rather than by other parties; but, in the absence of connivance on his part, it must be shown that the violence was so great as to prevent a fair and free election."

And on page 778 it is said:

"It is not necessary that the persons who are guilty of violence or intimidation should be connected with the candidate; but, if there is such violence that the voters cannot safely deposit their votes, the election should be set aside, regardless of the relation of the persons by whom it was committed."

"It is not necessary that the intimidation should proceed from a fear of personal injury; but a combination on the part of employers of laboring men to discharge their workmen, or an agreement not to employ persons unless they vote in accordance with their demands, will be sufficient to avoid the election, if the intimidation is so general as to affect the result."

[2, 3] The Supreme Court of Arkansas, in Patton v. Coates, 41 Ark. 111, has held that intimidation sufficient to render it uncertain what the result of an election would have been, will avoid it, though it may not have been such as would have influenced men of ordinary firmness. We are constrained to hold that in the instant election, it being shown that Mr. Carson would have voted for two of the contestees, but also would have voted for one of the contestants, Mr. H. C. Abshier, and that said ballot would have tied the result with Mr. Aiken, his opponent, the said vote between the two said parties should be determined a tie. In so far as Mr. Newt Tucker is concerned, the testimony shows that he had not read or heard of the opinion of the county attorney prior to the election, and did not offer to vote, and, neither being influenced by intimidation or the opinion of the county attorney, the holding of the lower court is correct as to him.

The second assignment of error is as follows:

"That said contestants now move the court to set aside its judgment and grant them a new trial on account of the following newly discovered evidence, to wit: That J. H. Suttles, contestee herein, moved to Liberty county to said drainage district about the month of August, 1916; that said Suttles, as disclosed by his testimony as a witness in this cause, had been living in Jefferson county for the year preceding August, 1915; that when the said J. H. Suttles became a resident of said district for six months prior to said election, nevertheless the said Suttles, as discovered by his testimony, was a resident of Jefferson county on the 1st day of January, 1915, and therefore was subject to the payment of a poll tax in said Jefferson county for the year 1915, and was so assessed in said Jefferson county for 1915, and the said Suttles did not pay his poll tax in said Jefferson county for the year 1915; that this fact did not come to the knowledge of contestants until the 14th day of June, 1916, after the trial of said cause; that said Suttles voted in said election, as contestants are informed and believe, for said contestees therein; that it was unnecessary for contestants to ascertain as to whether or not the said Suttles had paid his poll tax in the proper county, for the reason that the case, as made by the pleadings of the contestants and contestees at the time of the trial and as subsequently developed by the proof, showed beyond a question there was a tie vote between these two contestants and contestees Jesse Aiken and Geo. Parker; that the contestees in their pleadings set up that H. C. Smith was not eligible to the office of drainage commissioner because he lived without the district, but did not allege in their pleadings originally or at the time of the trial until after all the evidence was closed, which they did by a trial amendment, that H. C. Smith had voted in said election for the contestants, and that contestants did not expect to have to meet that issue, until said trial amendment was filed after the close of the testimony in the case; that said Suttles was elected as J. S. Suttles, whereas his real initials are J. H. Suttles, and said Suttles paid his poll tax in Liberty county in January, 1916, for the year 1915, which was not the proper place for payment as above alleged; that contestants did not know that said Suttles had been a resident of Jefferson county for the year 1915, and subject to the payment of a poll tax therein until the said Suttles testified that he removed from Jefferson county in April, 1915."

With reference to Mr. Suttles' place of residence on January 1, 1915, he testified as follows:

"I live at Raywood, and lived there at the time the election was held, and had been for some time. * * * I have been living in Raywood off and on for the past 13 years. The year before the election, part of the year I was in Jefferson county, and stayed there until along in April or May, about the time school closes. I have lived in Jefferson county as much as a year at a time, but didn't live there that much last year. I left Jefferson county about the latter part of April, and my wife came to Raywood, and then went to Houston on a visit. I had a place at Port Arthur during the storm, but my wife wasn't there during the storm, she was in Houston on a visit. She visited in La Porte and Strang before she went to Houston. She came to Raywood the Wednesday after the storm, the 18th, the first train out of Houston, and has been there since."

On hearing of contestants' motion for new trial, Mr. Suttles, contestee, being sworn as a witness, testified that in the election in controversy he voted for contestees, and in connection with the offering of said certificate contestants placed Mr. Suttles on the stand, and he testified that he had stated during the trial of this case that he had lived at Raywood, in Liberty county, off and on for 13 years; that he and his wife had kept a part of their furniture there and had a furnished room, which was kept for them all of the time at the home of his father-in-law. He further testified that on the 1st day of January, 1915, he was living in said town of Raywood with his wife. Appellants admit that in January, 1916, Suttles paid to Liberty county a poll tax for the year 1915.

[4] While the testimony is not free from all doubt, we find no error in the action of

the court in this matter. We are not prepared to say that it was shown conclusively that Suttles did not, as he testified, live in Liberty county, and pay his poll tax in Liberty county. This assignment is therefore overruled.

Appellants' third assignment of error is as follows:

"Because the evidence shows that H. C. Smith was a resident elector of the drainage district who voted at the election for contestees; hence the court erred in holding that he did not reside within said district."

The court heard all the testimony in this case with reference to the residence of Dr. Smith, and it would serve no useful purpose to set the testimony out in full. The trial court filed no findings of fact, and it seems to be well settled that this court must take as supporting the judgment any facts which may be found in the evidence, and there is testimony, it may be said, to support the court's finding. Therefore this assignment is overruled.

We have carefully considered the record, and the record reflects the fact clearly that Carson was entitled to vote and would have voted in the election as above set out, but was in doubt as to his rights and feared trouble in the courts, and in the event he had voted would have voted for Mr. Abshier and the two contestees above mentioned, and that therefore the vote was equally divided and tied between Abshier and Aiken.

Therefore, in this state of the record, the judgment of this court is that the judgment of the lower court be affirmed with reference to holding that Suttles and Parker were elected, but judgment will be here rendered that the vote as to Abshier and Aiken is a tie, and that matter will be herewith remanded, in order that the commissioners' court of Liberty county, as provided by law, shall decide who shall be drainage commissioner as between these two.

As so reformed, the judgment is in all things affirmed.