CANTWELL v. SUTTLES et al.    (No. 263.)

(Court of Civil Appeals of Texas. Beaumont. May, 1917.)

1. APPEAL AND ERROR ⬤1012(1)—REVIEW— FINDING OF COURT.

Unless the trial court's finding is against the great weight and preponderance of the evidence, so as to be manifestly wrong, it should be upheld by the appellate court.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3990–3992.]

2. ELECTIONS ⬤295(1) — QUALIFICATION OF VOTER—SUFFICIENCY OF EVIDENCE.

In suit contesting the election of commissioners for a drainage district, evidence *held* to sustain the court's finding that a voter was not qualified because he had not resided within the district for six months preceding the election.

[Ed. Note.—For other cases, see Elections, Cent. Dig. § 297.]

3. ELECTIONS ⚖═293(2)—RESIDENCE OF VOTER —EVIDENCE—STATEMENTS OF WIFE. ·

In view of the law fixing the place where a voter is entitled to vote as being where his wife resides, when he is not permanently separated from her, statements by the wife of a voter at an election for commissioners of a drainage district, tending to show where she resided, were admissible, in suit contesting the election, as throwing light on the disputed question of the voter's residence. ·

[Ed. Note.—For other cases, see Elections, Cent. Dig. § 289.]

4. APPEAL AND ERROR ⚖═1054(1)—HARMLESS ERROR—EVIDENCE—TRIAL TO COURT.

In suit contesting the election of drainage commissioners, where there was ample testimony, the admissibility of which was not questioned, sustaining the court's findings as to the residence of a voter, the admission of objectionable testimony on the point was harmless; the trial being to the court.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 4185.]

5. ELECTIONS ⚖═295(1)· — QUALIFICATION OF VOTER—SUFFICIENCY OF EVIDENCE.

In suit contesting the election of commissioners of a drainage district, evidence *held* to sustain the court's finding that a voter was qualified to vote on drainage commissioners.

[Ed. Note.—For other cases, see Elections, Cent. Dig. § 297.]

6. ELECTIONS ⚖═291—ILLEGALITY OF VOTE— BURDEN OF PROOF.

In suit contesting the election of drainage commissioners, the party challenging a voter has the burden to prove the vote was illegal.

[Ed. Note.—For other cases, see Elections, Cent. Dig. § 286.]

7. TAXATION ⚖═98 — PLACE OF TAXATION — PERSONALTY.

Personal property is subject to taxation in the county or district where it is situated.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 196–198, 200.]

8. APPEAL AND ERROR ⚖═1008(1)—REVIEW— FINDING ON UNCONTRADICTED TESTIMONY.

The trial court's finding on the uncontradicted testimony of a witness is conclusive on the Court of Civil Appeals.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 3955.]

Appeal from District Court, Liberty County; J. Llewellyn, Judge.

Suit by J. H. Suttles and others against H. L. Cantwell and others. From the judgment, defendant Cantwell appeals. Affirmed.

Marshall & Harrison, of Liberty, for appellant. C. H. Cain and E. B. Pickett, Jr., both of Liberty, for appellees.

BROOKE, J. This suit was filed for an injunction by J. H. Suttles, J. C. Akin, and George Parker, individually, and by the Liberty County drainage district No. 2, acting by said Suttles, Akin, and Parker, as commissioners for said district, as plaintiffs, against the appellant, H. L. Cantwell, and also H. C. Abshier and the county judge, and four county commissioners of Liberty county, as defendants; and by their petition plaintiffs alleged that said Suttles, Akin, and Parker were the duly elected, qualified, and acting commissioners for said drainage district, and at a general election held on November 7, 1916, throughout Liberty county, they were candidates for re-election as such commissioners, and that the defendants Cantwell and Abshier were also candidates for the same office; further it was alleged that said election was null and void, and an injunction was sought restraining the commissioners' court from canvassing the returns of said election and declaring the result thereof, and a temporary injunction to that effect was granted. Plaintiffs further alleged that if said election was held legal and valid, then and in that event the ˚said Suttles, Akin, and Parker received a majority of the legal votes cast in said election, and were lawfully elected as commissioners for said drainage district, and to maintain that plea there were allegations particularly charging certain votes to have been illegally cast. Also plaintiffs alleged that they were rightfully and legally vested with the title to said office of drainage commissioners and were in law the owners of title to said office, which is of the value of more than $500. Further, it was alleged that defendants were asserting title to said offices and making the claim that they had been duly elected thereto, and' were preparing to attempt to qualify and take possession of and deprive plaintiffs thereof, and thus to interfere and hinder· them in the performance of their· official duties. And the prayer of plaintiffs was that the temporary injunction which had been granted be perpetuated, and,· further, that they have judgment perpetually enjoining the defendants Abshier and Cantwell from thereafter in any manner interfering with or attempting to interfere with plaintiffs· in the performance of their duties as drainage commissioners, and for full relief, legal and equitable, general and special.

The defendants Cantwell and Abshier, calling them contestees in their answer, pleaded a general denial, and by special pleadings attacked the legality of several votes cast for plaintiffs. Upon a trial before the court, the said election was held legal, but the court found that five illegal votes were cast as follows: By Dr. H. C. Smith, August Fregia, and M. E. Ackers, who voted for the candidates H. C. Cantwell and H. C. Abshier; and by C. J. Barrow and H. A. Hotchkiss, who voted for the plaintiffs Suttles, Akin, and Parker. And after deducting those illegal votes from the total number of votes returned for the several candidates, the court concluded that H. C. Abshier received 16· votes, and J. H. Suttles received 15 votes, and that they were duly elected as commissioners for said drainage district in said election, and that J. C. Akin and H. L. Cantwell had each received 14 votes, and therefore referred to the county commissioners' court the question of appointing a com-

missioner for said third place, in accordance with the law in such cases made and provided.

Only H. L. Cantwell appealed from said judgment, and upon his request the trial court filed findings of fact and conclusions of law as follows:

## "Findings of Fact.

"(1) The court finds that at the general election held in Liberty county, on November 7, 1916, the following persons were candidates for the office of drainage commissioner of Liberty county, drainage district No. 2, namely: J. H. Suttles, J. C. Akin, Geo. Parker, H. C. Abshier, H. L. Cantwell, and M. E. Akers, and that said candidates were balloted on at the Raywood voting box which is located in said drainage district and is the usual voting place for election precinct No. 11 of Liberty county.

"(2) That Geo. Parker had been duly appointed by the commissioners' court as presiding judge of said election precinct No. 11, but being a candidate at said election for the office of drainage commissioner, he declined to serve as presiding officer, and at about 7:30 a. m. on November 7th (the day of the election), several voters assembled and elected C. W. Cardiff as presiding judge, but shortly thereafter Dr. H. C. Smith and other voters arrived and said Smith claimed that he had been appointed presiding judge by the commissioners' court, and he proceeded to take charge of the election as presiding judge, and continued to so act throughout the day, and after some objection was made to his so acting when he first claimed the authority; no further objection was made during the day by any of the officers of election at said polling place or by any of the voters who voted there.

"(3) I find that said election held as above stated was in all things (other than the casting of five illegal votes, as hereinafter particularly found) fairly, legally, and correctly held.

"(4) That said drainage district No. 2 includes a part of four election precincts in Liberty county as follows: Nos. 4, 5, 6, and 11, and the regular and usual voting places in said election precincts Nos. 4, 5, and 6 are located in that part of each of said election precincts which is without the said drainage districts, and the commissioners' court did not name a polling place for the election of said drainage commissioners at each of said voting precincts so partly embraced in said drainage district, and there was no other polling place within said drainage district at which qualified voters could vote for drainage commissioners except at the polling place in the town of Raywood.

"(5) I find that H. C. Abshier, G. T. Abshier, and M. K. Gertin were qualified voters and lawfully entitled to vote for drainage commissioners at the said polling place in Raywood, although they do not reside within that election precinct, but each of them resides in election precinct No. 6, for which election precinct the usual polling place is at the town of Devers, which is outside the said drainage district; however, I find that each of said three persons resides within said drainage district and were qualified voters therein.

"(6) I find that August Fregia voted at the said Raywood polling place and cast his ballot for H. C. Abshier, M. E. Akers, and H. L. Cantwell, and that his ballot was so counted for said three candidates, but I find that said August Fregia was not a qualified voter because he had not resided within said drainage district for six months next preceding said election, and he was not a resident property taxpayer within said district as required by articles 2580 and 2585, R. S. 1911.

"(7) I find that M. E. Akers voted in said election at the Raywood polling place and cast his ballot for himself, H. C. Abshier, and H. L. Cantwell, and his ballot was so counted for said three candidates, but I find that said M. E. Akers was not a qualified voter within said drainage district because he was not a resident property tax payer within said district as required by articles 2580 and 2585, R. S. 1911.

"(8) I find that Dr. H. C. Smith voted in said election at said Raywood polling place and cast his ballot for H. C. Abshier, H. L. Cantwell, and M. E. Akers, and his ballot was so counted for said three candidates, but I find that said Dr. H. C. Smith was not a qualified voter within said district because he had not resided within said district for six months next preceding such election.

"(9) I find that C. J. Barrow who voted in said election at said Raywood polling place cast his ballot for J. H. Suttles, J. C. Akin, and Geo. Parker, and that his ballot was so counted for said three candidates; but I find that said C. J. Barrow was not a qualified voter in said drainage district, because he had not resided in said district for six months next preceding such election.

"(10) I find that H. A. Hotchkiss voted in said election at said Raywood polling place and cast his ballot for J. H. Suttles, J. C. Akin, and Geo. Parker, and his ballot was so counted for said three candidates; but I further find that said H. A. Hotchkiss was not a qualified voter within said drainage district because he was liable to Montgomery county, Tex., for a poll tax for the year 1915, because a resident of that county on January 1, 1915, and that he had not paid same.

"(11) I find that all the other voters who participated in said election, except the five voters above specifically named, were qualified voters in said election, and that after deducting the said five illegal votes from the total votes of the respective candidates for whom said five illegal votes were cast and counted, the true and correct result is as follows: The defendant H. C. Abshier received 16 votes, the plaintiff J. H. Suttles received 15 votes, the defendant H. L. Cantwell and the plaintiff J. C. Akin each received 14 votes, and the plaintiff Geo. Parker received 13 votes and one M. E. Akers (who was also a candidate, but is not a party to this suit) received 12 votes.

## "Conclusions of Law.

"(1) The court concludes that the votes of August Fregia, M. E. Akers, and Dr. H. C. Smith (they not being qualified voters), having been illegally cast and counted in favor of H. C. Abshier and H. L. Cantwell, should be and they are by the court deducted from the total votes reported in favor of said two candidates, and therefore the true and correct vote which said two candidates received was as follows: The said H. C. Abshier received 16 votes and the said H. L. Cantwell received 15 votes, and that only the said number of votes were cast for said two candidates by persons lawfully qualified to vote in said election upon the question of electing drainage commissioners for said drainage district.

"(2) The court concludes that the votes of C. J. Barrow and H. A. Hotchkiss (they not being qualified voters) having been illegally cast and counted for J. H. Suttles, J. C. Akin, and Geo. Parker, should be and they are by the court deducted from the total votes reported in favor of said three candidates, and therefore the true and correct vote which said three candidates received was as follows: The said J. H. Suttles received 15 votes, the said J. C. Akin received 14 votes, and the said Geo. Parker received 13 votes, and that only the said number of votes were cast for said three candidates by persons lawfully qualified to vote in said election upon

the question of electing drainage commissioners for said drainage district.

"(3) The court concludes that the plaintiff J. H. Suttles and the defendant H. C. Abshier were duly elected as drainage commissioners in and for said drainage district No. 2, and that they possess the qualifications required by law to become drainage commissioners of said district, and are lawfully entitled to qualify and hold said office until the qualification of their successors in the manner and form prescribed by law.

"(4) The court concludes that the plaintiff J. C. Akin and the defendant H. L. Cantwell having each received the same number of votes for the third commissioner of said drainage district, the question of selecting and appointing a commissioner for said third place should be referred to the county commissioners' court of Liberty county, Tex., so that court may promptly proceed to select and appoint either the said J. C. Akin or the said H. L. Cantwell as the third commissioner for said Liberty county drainage district No. 2 in accordance with the law in such cases made and provided, and that when said commissioners' court so elected and appointed the said third commissioner, that the commissioner so appointed shall be lawfully entitled to qualify and hold said office until the qualification of his successor in the manner and form prescribed by law."

By the first assignment of error, complaint is made of the action of the court in excluding from the number of votes that appellant received on November 7, 1916, the vote of H. C. Smith, because said Smith was a legal voter by being a property tax paying resident citizen of drainage district No. 2, Liberty county, on November 7, 1916, and had been such a resident taxpayer since January 1, 1916.

[1, 2] It will be seen that the court found as a matter of fact that Dr. H. C. Smith was not a qualified voter in the election for drainage commissioners, and unless this finding is against the great weight and preponderance of the evidence, so as to be manifestly wrong, the finding of the court should be upheld by the appellate court, and if there is evidence to sustain such finding of the lower court, this court will hold that it was justified in making the finding. Suffice it to say, without going into details, there is testimony in the record to sustain the finding of the court. L. W. Akin, among other things, testified:

That he asked Smith where he was living, and Smith answered, "I have moved out on the farm," and that he (Akin) said, "I was at the town house;" and Smith said, "No, we moved out on the farm." That that happened some time prior to the election that was held in March of 1916. "It was in July a year ago, I think. He has been living out on the farm since that time up until 30 days before this last election, when he moved back into Raywood. This last election was held on November 7, 1916, and he moved back to Raywood 30 days before that time. Dr. Smith is a married man; he has a wife, but no children."

Akin further testified:

"Yes, sir; I mean to tell this court that Dr. Smith has not been living in Raywood since last spring, up until 30 days before November 7, 1916. I know that he did not live there, because he wasn't there. I know that he moved back just 30 days before the election for the simple reason that I felt confident that he would move back in time to vote in that election, and I watched for it. I forget the night that he moved in, but I know it was 30 days, because when we knew he moved back we figured it up, and it was just 30 days at that time. He did not reside there in Raywood at all prior to that 30 days before the election. He did not live there at all as a home. I do know that he did not live there as a home."

He further testified:

"During the time Dr. Smith was living out there on the farm, the house in Raywood appeared to be vacant and nobody living in it. And over the windows—I took them to be screens from an old threshing machine nailed up over the windows, and there was no live stock or anything about the yard, and the weeds were growing up in the yard. The fence was up and the gates closed. The fence was down partly at one time, and it may be down yet for what I know. Those things that were over the windows disappeared after he moved back to town, that is, all of them except two. I think there are two of them up yet."

Mrs. Annie Meacham testified:

"I live at Raywood, and have lived there for 16 years the 4th of this month. I know Dr. H. C. Smith, and have known him since the first time he came down there. I believe it is 3 years this coming winter the first time he came down there. He at one time lived in Raywood, and when he lived there he lived right across the street from my home. I recall the time that he and his wife moved away from there out to the farm, and they took everything they had with them. They had pigs, chickens, and hogs and everything, and they took them to the farm. I think that was in July, a year ago. They moved everything, and did not make much use of the house there in Raywood. When they would come in for their mail they would sometimes come up there. The appearance of the house was just like any other house that is closed and vacant. The windows were nailed up on the outside. That house is located right on the public shell road, right across from me. The windows were nailed up, and the gate was left open, and the stock went in and ate off the grass and broke down the fence, and when he come back this fall he nailed it up and put his mules in where he was making hay."

This witness further testified:

"Their house looks like a vacant house. They moved their furniture from there, but not quite all of it. They left a little there, and the rest of it they took out to the ranch. I have had occasion to go over to that house many times. After the doctor came back from the North he brought a leather couch and a dining table and two Morris chairs. One of them they took out to the farm, and one of them they left there. They have a cooking stove there, but they took their beds out, but they had a cot there and this leather couch. If they had any other furniture in the house I did not see it, and I have been all over the house."

Mrs. Margaret Parker testified:

"I know Dr. Smith. My house is about 50 yards from the place where he lived in Raywood when he lived there. The two houses are about 50 yards apart, or something like that. There are no houses intervening between my house and his, and they are on the same block. Dr. Smith and his wife moved away from the house in Raywood the week after the 4th of July, 1915. They moved to the farm."

And, further:

"I couldn't say exactly how long it had been before that since I had seen them there at night, or early in the morning, but they stayed there a

few nights the first part of April, or the last part of March. From that time until I saw them there in October they had not been there at night. There is a fence between my yard and theirs. It is not a solid fence that cannot be seen through; it is just a wire fence. The outside fence to their place has been down during the time they were not living there, and the cattle and stock have been running in there just the same as on the outside. I say that they never stayed there at night from April until October, and I am positive about that; that is, pretty positive. I could not be absolutely positive about it, for, of course, I was not in the house every night, but I will say that they were not there. I did not see them there. If they stayed there at night they left before daylight the next morning; of course they could have done that. I didn't see any light there, and I will say I know that if they stayed there they did not have a light. I can testify that during the months of April, May, June, July, August, and September, that there were no lights in that house, and I further say that every night from April until October that Dr. Smith and his wife did not stay there at that house."

**C. W. Cardiff testified:**

"I know Dr. Smith, and also know his wife, and I recall about the time they moved away from Raywood, and left that house to go out on the farm. At that time I recall Mrs. Smith having made a statement relative to where they were going to live. She was teaching the Bible class in the Sunday School, and we voted on our teachers and officers twice a year, in January and July, and we talked about electing her for another term, and she said she couldn't teach. * * * She said she couldn't teach, as they were going to move out on the farm, and that we would have to elect somebody else. That was just before the election, in June. After that they left the house in Raywood, and the stock was taken away and the windows nailed up. The fence was torn down, and the cattle could go in."

**J. H. Suttles testified:**

"I know when Dr. Smith moved back into the town of Raywood; that is, I know just about the time. He moved back along about the 6th or 7th of October. After we tried the election contest case here last summer Dr. Smith did not make any different use of the place in Raywood than he made before we tried that case. He did not take up his habitation in that house in Raywood until about the 6th or 7th of October, and prior to that time he lived out in the country on his farm. I know where that farm is, and it is outside of that drainage district. I might add why I say I know he came back to Raywood about the 6th or 7th was because we expected him to move back about that time. The appearance of the house there at Raywood before he came back was about the same as it had always been all the summer. There had been no change with reference to taking down the nailed up places over the windows, nor in the appearance of the place, except that there had been a few bones burned up from a mule that had died there. The windows of the house appeared to be nailed up. The windows were nailed over with screens, that is the same as come out of a separator, galvanized iron and perforated. That was nailed over several of the windows. They were nailed up until about a month ago. After he returned, about a month ago, I noticed that he removed one of them from off the front porch."

And, further:

"During the time that this house Dr. Smith claims as his home was nailed up, I never saw any evidences of human habitation around there during the day as I would pass. That house faces right on the main highway that runs through Raywood. The windows on both the sides and the front were nailed up."

Upon the extracts above given, it will be seen that there was ample evidence before the court to justify its finding. There being no error in the action of the court in this matter, the assignment is overruled.

The second assignment of error is as follows:

"The court erred in permitting the witnesses J. H. Suttles, C. W. Cardiff, J. C. Akin, Geo. Parker, Mrs. Meachem, and L. W. Akin, respectively, to testify to conversations and statements alleged to have been made by Mrs. H. C. Smith, wife of H. C. Smith, pertaining to and touching upon where the residence of the said H. C. Smith had been for six months prior to November 7, 1916, and especially that said witness had been living on the farm, which was out of the drainage district No. 2, all of which is shown by bills of exception No. 1 to 7, inclusive, and asked to be considered a part hereof, because said testimony was hearsay, not sworn to, ex parte, and because H. C. Smith or head of the family had right to determine the residence thereof."

The point seems to be made that this is being urged only as to the testimony of C. W. Cardiff and Mrs. Parker.

[3, 4] By the law of this state, which seems to fix the place where a voter is entitled to vote as being where his wife resides, when he is not permanently separated from her, we are of opinion that statements made by the wife tending to show where she resided are admissible as throwing light on the disputed question. We do not believe that the testimony, if objectionable, is sufficient to require a reversal of this case. In the trial of a case before the court, perhaps, the same strictness with regard to the admission of testimony is not required as in trial before a jury, and especially if it does not appear that the court gave weight and was influenced by such testimony, whose legality is called in question. In the present case there is ample testimony, about the admission of which there is no question, to sustain the findings of the court on the particular facts, as testified to by Mrs. Smith. As said by the court in the case of Davis v. State, 75 Tex. 428, 12 S. W. 959:

"It is not reversible error to admit improper testimony in a trial before the judge without a jury, unless it should appear that he has considered it and given it weight. The fact that Rodriguez came from San Antonio about the 1st of May, 1888, was established by other proof."

Finding no merit in the assignment, it is overruled.

The third assignment complains of error in the action of the lower court in holding that J. H. Suttles was a qualified voter to vote upon drainage commissioners on November 7, 1916, because on January 1, 1915, the said Suttles was a resident of Jefferson county, Tex., and during said month of January, 1915, assessed his poll tax for Jefferson county in said Jefferson county, and was subject to a poll tax for the year following January 1, 1915, in Jefferson county, and did not pay the same; that said J. H. Suttles, as shown

by the evidence, voted against appellant and for J. C. Akins, and his vote should be excluded.

[5] As we have heretofore stated in this opinion, the rule is that this court will not disturb a finding of fact, unless it. clearly appears that it is against the great weight and preponderance of the testimony such as to be manifestly wrong. With reference to the poll tax being assessed in Jefferson county, it will be sufficient, perhaps, to say that a citizen is subject to a poll tax and is liable for that tax to the county in which he is a resident upon January 1st. By the poll tax records of Liberty county, it is shown that J. H. Suttles did, in fact, pay his poll tax for 1915 to Liberty county on January 4, 1916. The trial court had the witnesses before him in person, and as said by the court in the case of Abshier v. Aiken, 191 S. W. 766:

"While the testimony is not free from all doubt, we find no error in the action of the court in this matter. We are not prepared to say that it was shown conclusively that Suttles did not, as he testified, live in Liberty county, and pay his poll tax in Liberty county."

In passing, it may be said that the opinion of the court in the Abshier Case, supra, was with reference to the identical party, and that it was settled in that case, as in this, adversely to the contention of appellant, that Suttles was entitled to vote. After careful consideration, we are of opinion that there is no merit in the assignment, and it is overruled.

By the fourth assignment, complaint is made that the court erred in holding that J. H. Suttles was qualified to fill the office of drainage commissioner in drainage district No. 2, Liberty county, Tex., because the evidence shows that said J. H. Suttles, at the time of his pretended election on November 7, 1916, was not a legally qualified voter in this: That the said J. H. Suttles on the 1st day of January, 1915, was subject to poll tax in Jefferson county, and did not pay the same prior to January 1, 1916, and because, further, the evidence shows that the said J. H. Suttles was a resident of Jefferson county, Tex., on January 1, 1915. What we have said above disposes of this assignment, and it is therefore overruled.

Complaint is made by the fifth assignment of error that the court erred in holding that Paul Jacko was a legally qualified voter to vote on drainage commissioners in drainage district No. 2, Liberty county, Tex., on November 7, 1916, because said Paul Jacko, was not a property tax-paying citizen of said drainage district on November 7, 1916, and because he was not a resident of said district

on said date; and because he had not been a resident of said district for six months prior to said date; and because the evidence is insufficient to show that he owned any property subject to taxes in said district, or out of said district on January 1, 1916, or at any time subsequent thereto, and said vote should be excluded, the evidence having shown that said Paul Jacko voted against this appellant and for J. C. Akin.

[6-8] It seems that Paul Jacko was one of appellant's witnesses. There is testimony to sustain the finding of the trial court that Jacko was a resident of the drainage district for six months preceding the election on November 7, 1916. The party who challenges a voter has the burden of proving whether the vote was illegal. The testimony given by Jacko himself, who was called by the defendants as their witness, is undisputed. The facts, according to his statement, are that he owned hogs on January 1, 1916; that their accustomed range was around the Ford place, which is located in the drainage district. Personal property is subject to taxation in the county or district where it is situated. Without indulging in speculations or comparisons with reference to and as between the testimony of Richard Mulvey, who seems to have testified in this case that he owned a violin on January 1st, although his furniture, so he testified, is not worth over $5 or $10, or that of Newt Tucker, who testified that he owned a tramp dog, a watch, an organ, and a gun, the value of which was not stated, and both of whom seem to have voted for appellant, it may be observed that the lower court had full opportunity, which it is not doubted he exercised, to inquire into the matter fully upon the trial of the case. He heard the witnesses, observed their manner of testifying, concluded from the testimony of Jacko that he was worthy of credence, and this finding on the testimony of Jacko, not being controverted by any other witness, is conclusive upon this court. We have given that careful consideration to this assignment which all of appellant's assignments deserve in this cause. We have, however, not been able to find any merit in the same, and it is therefore overruled.

With reference to the cross-assignments Nos. 1 and 2 that have been filed, it is sufficient to say that the findings of the lower court, and the inferences to be drawn from them, and the conclusions arrived at, are believed to be sound. We believe that the parties have had a fair and impartial trial in the lower court; that the findings of the court are based upon the right, reflected by the record, and, so believing, the judgment is in all things affirmed.